# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 2000 Session

## STATE OF TENNESSEE v. VINCENT BOLDEN

### Appeal from the Circuit Court for Henry County
### No. 12735    Julian P. Guinn, Judge

---

### No. W1999-01481-CCA-R3-CD - August 4, 2000

---

This appeal arises out of the defendant's conviction for selling a controlled substance within 1,000 feet of a public or private school. He challenges the sufficiency of the evidence to support his conviction. After careful review of the record, we conclude that the evidence is sufficient to support the defendant's conviction and affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Jim L. Fields, Paris, Tennessee, for the appellant, Vincent Bolden.

Paul G. Summers, Attorney General and Reporter; Tara B. Hinkle, Assistant Attorney General; Robert "Gus" Radford, District Attorney General; and Steven L. Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Vincent Bolden, was indicted by a Henry County grand jury for selling and delivering 0.1 gram of rock cocaine, a Schedule II substance, within 1,000 feet of public or private school property on September 20, 1997. After a one-day trial on March 1, 1999, the jury returned a guilty verdict against the defendant on the count relating to the sale of cocaine. On March 31, 1999, the defendant was sentenced as a multiple Range II offender to twelve years incarceration, fined $10,000, and ordered to pay restitution of $1,097.40. The defendant raises a single issue for our consideration on appeal: whether the evidence presented at trial was sufficient to support the jury's verdict. Upon our *de novo* review, we conclude that the evidence was sufficient to support the jury's verdict and affirm the judgment of the trial court.

# FACTS

Donald Wayne Blackwell, a criminal investigator and agent for the Twenty-Fourth Judicial District Drug Task Force, testified as the State's first witness. In 1997, he was part of an undercover operation called "Operation Safe Home" that was working in conjunction with the federal Office of the Inspector General[1] to clean up crime in public housing. As part of its efforts, the Task Force focused on the Harrison Meadows Apartment Complex in Paris, Tennessee. The Task Force moved an informant, Rhonda Swift, into apartment 5 of the Harrison Meadows projects and had Herschel Harvell, a federal agent with HUD, pose as Swift's boyfriend from time to time. As part of his cover as Swift's boyfriend, Agent Harvell also pretended to be a criminal who had been released on parole. Agent Harvell would make drug purchases in the area and turn the evidence over to Agent Blackwell. Blackwell testified that he measured the distance from apartment 5 to the property of Inman School, located across the street from the Harrison Meadows projects, and found the distance to be 580 feet. Agent Blackwell recalled meeting Agent Harvell in Memorial Park on Sunday, September 21, 1997, and receiving a $20 rock of crack cocaine from Harvell. The rock Blackwell received that day was marked and admitted into evidence. At trial, Agent Blackwell was able to identify the defendant as Vincent "Truck" Bolden from his prior knowledge of the defendant.

On cross-examination, Agent Blackwell stated that no tapes or recordings were made of the drug transaction with the defendant, and he (Blackwell) did not personally observe the transaction. He explained that drug informants are paid $100 each time they turn in a drug dealer, as long as the agent is able to make a case against the dealer. He stated that the school building itself is close to 1,000 feet from apartment 5, but Blackwell also stated that the school property includes the surrounding areas where the students are.

The next witness for the State was Lisa J. Mays, a special agent forensic scientist for the Tennessee Bureau of Investigation Crime Laboratory. Special Agent Mays conducted the laboratory analysis of the rock cocaine that was obtained during the undercover buy from the defendant. She testified that her test results showed that the rock contained 0.1 gram cocaine base.

Rhonda K. Swift, the informant, was then called to testify on behalf of the State. She stated that she was working undercover in another location when she was brought to Paris, Tennessee, to stay in apartment 5, section 502, of the Harrison Meadows Apartments. Agent Herschel Harvell was posing as her boyfriend. Ms. Swift testified that she met the defendant, who was not a resident of the complex, through his cousin, Nakia Upchurch. Shortly after meeting the defendant, Ms. Swift gave the defendant and some of his friends a ride to another county to buy beer, and the defendant made it clear to her that he could "get anything [drugs] anybody needed," including crack cocaine. On September 20, 1997, Ms. Swift and Agent Harvell held a cookout at their apartment and invited the defendant. Ms. Swift telephoned the defendant to see if he was coming to the party and told him that she needed him to bring her something. When the defendant arrived at the apartment, Ms. Swift

---

[1] Agent Blackwell stated that the Office of the Inspector General is the investigative agency over the United States Department of Housing and Urban Development ("HUD"). HUD runs or subsidizes public housing.

told him that she needed some crack cocaine. She did not remember what time of day it was when the defendant arrived at her apartment but did remember that he brought a woman and two toddlers with him. The defendant then made a call on his cellular phone, and a white Corsica arrived at the apartment about fifteen minutes later. Ms. Swift remembered seeing two black females in the car. Agent Harvell told the defendant that he wanted $20 worth of crack and gave Ms. Swift the money, which she gave to the defendant. The defendant completed the transaction with the female sitting in the passenger side of the Corsica within view of Ms. Swift. The defendant then returned to the apartment and handed the crack cocaine to Agent Harvell. Ms. Swift estimated that about ten to fifteen adults and children arrived in the afternoon for the cookout, and the defendant stayed most of the day.

Ms. Swift stated that she had no felony convictions but did have a misdemeanor charge against her for writing a bad check. She admitted that she used to be a crack addict but explained that she had enrolled in a drug rehabilitation program in 1993 to get off drugs and began working with the police at the end of that year. For each drug transaction she made as a confidential informant, Ms. Swift was paid $100. She worked undercover for four and one-half years but quit because her life had been in danger at least ten times. She had to leave the Harrison Meadows Apartments after a man, who had been charged as a result of Ms. Swift's undercover work, recognized her. She was afraid he was going to shoot her.

On cross-examination, Ms. Swift stated that she and Agent Harvell made one or two drug buys per week while at the Harrison Meadows projects. When pressed for a more exact time that the defendant arrived on the day of the cookout, Ms. Swift stated that she thought she had called the defendant sometime before noon. Although she could not give the specific time of the defendant's arrival at the apartment, she thought it was fifteen or twenty minutes after the phone call, which defense counsel placed at 12:15 p.m. The defendant stayed at her apartment except when Ms. Swift took him to pick up his aunt's grill. Ms. Swift gave the defendant's cellular phone number and the license plate number of the white Corsica in her report. She did not know if the two women in the Corsica were ever arrested.

The State's last witness was Agent Herschel Harvell, Jr., a special agent criminal investigator with the Inspector General's Office of HUD. Agent Harvell was part of "Operation Safe Home," a joint effort with public housing authorities, local law enforcement, and federal agencies to investigate drugs and violent crimes in federal housing projects and subsidized housing. As part of this operation, Agent Harvell and Ms. Swift occupied apartment 5 at Harrison Meadows, posing as boyfriend and girlfriend. Agent Harvell identified the defendant as an individual he had dealt with. Agent Harvell recalled that the defendant and another man came over on the morning of September 20, 1997. Ms. Swift had mentioned to the defendant that she wanted to get some drugs that day. The defendant made a cellular phone call after Agent Harvell told him that he wanted $20 worth. About fifteen minutes later, a white Corsica pulled up with two black females in it, and Agent Harvell saw the drug transaction take place between these women and the defendant. After receiving the drugs, Agent Harvell placed the cocaine in a locked bag in the bedroom until he could give it to Agent Blackwell. He stated that Ms. Swift was able to get the license plate number of the white

Corsica. A diagram showing the relationship of apartment 5, section 502, to the other sections and the road system at Harrison Meadows was introduced into evidence through this witness.

On cross-examination, Agent Harvell stated that he had only been involved in three or four narcotics investigations with HUD, an amount that Harvell did not consider to be "limited" experience but also not substantial narcotics experience. He admitted that investigators try to get the suspects on audio or video tape, but a tape was not made of this transaction. According to Agent Harvell, he had not met the defendant before the day of the cookout and had not purchased drugs from the defendant previously. He remembered some of the residents and guests who came to the barbeque on September 20, including Nakia Upchurch and another cousin of the defendant. Agent Harvell's recollection of the time that the defendant arrived at the apartment differed from Ms. Swift's, in that he thought the defendant arrived around 10:00 or 10:30 a.m. to help Ms. Swift get the grill before the other guests arrived. After returning with the grill, Agent Harvell did not remember the defendant leaving again during the cookout. He did not know how the defendant got to the cookout. Agent Harvell estimated the number of guests at the party to be between twenty and twenty-five. The State then rested its case.

The only witness called for the defense was Timothy LeDon Davis, Jr., the defendant's first cousin. He testified that both he and the defendant graduated from Henry County High School, and he had known the defendant all of his life. Davis testified that he was the assistant manager for the Kentucky Fried Chicken on Mineral Wells and was with the defendant on the day of the cookout, September 20, 1997. Davis stated that he and the defendant drove in Davis's car and arrived at the party together around 4:00 or 4:30 p.m. Davis worked that day until around 2:30 p.m. Davis never saw the defendant leave the party and estimated that there were fifteen to twenty people there. Davis never saw the defendant with a pager. He stated that the defendant lived with their grandmother on Jones Bend Road during the period of time in question.

On cross-examination, Davis admitted that the defendant had no legal connection with the housing project. He denied that a woman and two small children accompanied the defendant to the cookout but stated that just he and the defendant went together to the party. Davis denied using the bathroom at the apartment to smoke marijuana and denied that Agent Harvell saw him smoking marijuana there. The defense then rested its case.

Agent Harvell was recalled by the State as a rebuttal witness. Agent Harvell testified that, during the cookout, he heard a door slam and went to look in the bathroom. There he saw Davis and Upchurch smoking marijuana. He told Ms. Swift what he saw. Agent Harvell stated that he had previously bought drugs from Upchurch and was able to describe the differences in appearance between the defendant and Upchurch. According to Agent Harvell, the defendant has a receding hairline, looks older than Upchurch, and has a different body structure, voice, and facial features than his cousin.

Agent Blackwell was recalled as the last rebuttal witness for the State. He explained to the jury why video or audio taping of this transaction was not made. Surveillance equipment was to be installed in the apartment, but the equipment had to be sent back to the factory due to technical

-4-

problems. The license plate number for the white Corsica provided by Ms. Swift showed that the owner was Devera Walker, a male. At the time of trial, the two females in the car had not been identified.

## ANALYSIS

### Sufficiency of the Evidence

The defendant argues that the evidence presented at trial was insufficient to support a guilty verdict beyond a reasonable doubt as required by Tennessee Rule of Appellate Procedure 13(e). He attaches particular significance to the following: (1) the discrepancy in the time of the defendant's arrival at the cookout as given by the paid informant (around noon) and Agent Harvell (around 10:30 a.m.); (2) the defendant's cellular phone number given by the informant, which was disputed by the defendant's cousin, Tim Davis; (3) Davis's testimony that the defendant arrived with him around 4:00 p.m.; (4) the lack of physical evidence, such as a video or audio recording; and (5) the prosecutor's reference to the defendant being a major player in the drug trade without evidence of such. The State contends that the defendant's arguments are founded on the credibility of witnesses, an issue decided by the jury and resolved in favor of the State. We agree with the State that the evidence was sufficient for a rational jury to find the defendant guilty of every element of the offense beyond a reasonable doubt and affirm the judgment of the trial court.

The defendant's initial presumption of innocence is lost following a jury conviction and replaced with a presumption of guilt; thus, on appeal, the burden is now shifted to the defendant to prove the insufficiency of the evidence. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This court must affirm the convictions unless the evidence presented at trial was so deficient that no rational trier of fact could have found all of the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). This rule has been found by our courts to be applicable to a conviction based on direct or circumstantial evidence or a combination of both. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990).

In determining whether the evidence was sufficient to support a conviction, we do not re-weigh the evidence or substitute our own inferences for those of the trial court. Tenn. R. Crim. P. 33(f); State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996); State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Furthermore, the State is entitled to the strongest legitimate view of the evidence presented and all reasonable inferences drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993). A jury verdict accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State's theory. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).

After a careful review of the record in the light most favorable to the State, we conclude that there was sufficient evidence to support a guilty verdict against the defendant for the sale of a

controlled substance within 1,000 feet of a public or private school. The elements of the offense are set out in Tennessee Code Annotated § 39-17-417 as follows:

> (a)     It is an offense for a defendant to knowingly:
> . . . .
> (3)     Sell a controlled substance[.]

This offense is a Class C felony when the amount of the controlled substance involved is less than 0.5 grams, but this classification is enhanced to a Class B felony when the sale occurs within 1,000 feet of school property. Tenn. Code Ann. §§ 39-17-417(c)(2), -432(b) (1997).

The inconsistencies in testimony that the defendant relies on are relatively minor ones that can occur when a trial takes place a year and a half after the events occur. A time discrepancy of an hour and forty-five minutes in pinpointing the defendant's arrival time at a day-long cookout does not go against the weight of the other evidence presented at trial showing that he knowingly sold crack cocaine to the undercover agents within the required distance of school property. Ms. Swift first testified that she could not remember what time it was when the defendant arrived but could place the time shortly after she called the defendant and before the other guests arrived. Both she and Agent Harvell testified that the defendant arrived early to go with Ms. Swift to pick up a grill for the cookout. Under cross-examination, Ms. Swift eventually acquiesced at the insistence of defense counsel to 12:15 p.m. We see nothing in this testimony that would cause serious questions as to the drug transaction itself.

In addition, Ms. Swift was very specific about the cellular phone number that the defendant had given her, and both Ms. Swift and Agent Harvell testified that the defendant used a cellular telephone to call for the drug delivery. Timothy Davis only testified that he had never seen the defendant with a pager, which is significantly different from a cellular phone. Even if Davis were using the terms interchangeably, the jury obviously did not believe the defendant's assertions; nor did they believe Davis's testimony that he and the defendant did not arrive at the cookout until late in the afternoon. These are issues of credibility which we do not disturb on appeal.

The defendant's assertion that there was insufficient physical evidence to support the conviction is likewise without merit. Both Agent Harvell and Ms. Swift witnessed the drug transaction between the defendant and the women in the white Corsica, and Agent Harvell bagged, labeled, and stored the cocaine until handed to Agent Blackwell the next day. The substance was analyzed by the TBI Lab and found to contain 0.1 gram cocaine base. That is very incriminating physical evidence in and of itself. The lack of audio or video tape evidence was explained by Agent Blackwell as due to faulty equipment that had to be sent back to the factory. In other words, Blackwell's testimony was that proper equipment was not available to record the drug sale. The jury was apparently satisfied with the physical evidence presented.

The defendant's last complaint relating to the prosecutor's closing statements that the defendant was a major player in the drug industry is also without merit. This could have been

-6-

inferred by the testimony of several witnesses, and we fail to see how these statements could have affected the outcome of the trial. There was evidence presented through the testimony of Ms. Swift that the defendant represented himself to her as someone who could get any type of drug anyone wanted. His ability to make a phone call and have drugs delivered to him fifteen minutes later certainly gives an inference that he was "well-connected." Agent Blackwell stated that he had prior knowledge of the defendant as well. The fact that the police did not get video or audio evidence on the defendant was explained by Agent Blackwell, and there were two eyewitnesses to the transaction who were able to testify at trial to the specifics of the events that day. The testimony of Ms. Swift and Agent Harvell was consistent on this point. Ms. Swift was even able to provide the license plate number of the delivery car, although, not surprisingly, the owner was not one of the two women making the delivery. Since there was a substantial amount of evidence from which a rational jury could conclude beyond a reasonable doubt that the defendant sold cocaine within 1,000 feet of school property, we fail to see how these remarks by the prosecutor could have affected the outcome of the trial.

## CONCLUSION

After a careful review of the evidence, we conclude that the defendant has failed to carry his burden of showing that the evidence presented at trial was insufficient for a jury to find him guilty beyond a reasonable doubt. We, therefore, affirm the judgment of the trial court.

 

 

_____
ALAN E. GLENN, JUDGE