IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
MAY SESSION, 1999

FILED

August 19, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **No. 01C01-9802-CC-00075** |
| | ) | |
| Appellee | ) | |
| | ) | **HICKMAN COUNTY** |
| vs. | ) | |
| | ) | **Hon. Cornelia A. Clark, Judge** |
| **GARY EUGENE ALDRIDGE,** | ) | |
| | ) | **(Aggravated Kidnapping;** |
| Appellant | ) | **Aggravated Rape, 2 cts;** |
| | ) | **Rape; Simple Assault, 2 cts)** |

For the Appellant:

**John P. Cauley**
Asst. Public Defender
407-C Main Street
P. O. Box 68
Franklin, TN 37065-0068


**John H. Henderson**
District Public Defender

For the Appellee:

**Paul G. Summers**
Attorney General and Reporter

**Daryl J. Brand**
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
2d Floor, Cordell Hull Building
Nashville, TN 37243-0493


**Joseph D. Baugh**
District Attorney General

**Ronald Davis**
Asst. District Attorney General
P. O. Box 937
Franklin, TN 37065-0937


OPINION FILED: _____

AFFIRMED



**David G. Hayes**
Judge

## OPINION

The appellant, Gary Eugene Aldridge, was convicted by a Hickman County jury of one count of aggravated kidnapping, two counts of aggravated rape,[1] one count of rape, and two counts of simple assault.[2] For these offenses, the trial court imposed an effective sentence of sixty years to be served in the Tennessee Department of Correction to be followed by an effective consecutive sentence of seventeen months and twenty-nine in the local workhouse.[3] In this appeal as of right, the appellant challenges the sufficiency of evidence necessary to sustain his convictions for aggravated rape and rape. He also disputes the propriety of the trial court's imposition of consecutive sentences.

After a review of the record, we find the appellant's issues without merit. The judgments of conviction and sentences entered by the trial court are affirmed.

---

[1]The appellant was charged and convicted of aggravated rape pursuant to an exception to the limited spousal exclusion. See Tenn. Code Ann. §§ 39-13-502(a)(2) (1996 Supp.); 39-13-507(b)(1)(C) (1990). Likewise, he was convicted of rape pursuant to an exception to the limited spousal exclusion. See Tenn. Code Ann. §§ 39-13-503(a)(1)(1996 Supp.); 39-13-507(b)(1)(C). We note that Tenn. Code Ann. § 39-13-507(b) and (c) do not define new and separate offenses apart from the sexual offenses by a non-spouse contained in Tenn. Code Ann. § 39-13-501 et seq. (1990). Rather, the purpose of these subparts is to eliminate the marital exemption for sexual offenses under certain circumstances. But cf. State v. Terry Allen Dominy, No. 01C01-9512-CC-00404 (Tenn. Crim. App. at Nashville, May 30, 1997), perm. to appeal granted, (Tenn. Mar. 2, 1998) (finding spousal rape a lesser grade offense of aggravated rape).

[2]The appellant was charged in a ten count indictment with three alternative counts of aggravated kidnapping, four counts of aggravated rape, one count of aggravated assault, and two counts of simple assault. The State nolled Count 2 of the indictment (aggravated kidnapping to facilitate a felony) prior to its submission to the jury. The jury returned a guilty verdict as to Count 1, aggravated kidnapping causing bodily injury, and not guilty as to Count 3, aggravated kidnapping in order to terrorize the victim. The appellant was also found guilty as to Counts 4 & 5, aggravated rape (vaginal and anal). The jury found the appellant not guilty of Count 6, aggravated rape (oral penetration), and guilty of the lesser offense of rape in Count 7, aggravated rape (vaginal penetration). The trial court granted the appellant's motion for judgment of acquittal as to Count 8, aggravated assault committed in violation of an order of protection. The appellant was also found guilty of the misdemeanor assaults charged in counts 9 and 10.

[3]Specifically, the trial court imposed the following sentences:

| Count 1: | Aggravated Kidnapping | Class B | 12 years |
| Count 4: | Aggravated Rape | Class A | 24 years |
| Count 5: | Aggravated Rape | Class A | 25 years |
| Count 7: | Rape | Class B | 11 years |
| Count 9: | Misdemeanor Assault | Class A | 11 months 29 days |
| Count 10: | Misdemeanor Assault | Class A | 6 months |

The court ordered that Counts 4, 5, 7, 9, and 10 be served consecutively to each other and concurrently with Count 1, for the resulting effective sentence of sixty years, seventeen months, and twenty-nine days.

**Background**

In May of 1996, Etta Mae Aldridge traveled from Monterrey, California to the appellant's residence in Hickman County to visit and, apparently, to discuss their prospects for marriage. The appellant and Etta Mae had known each other for approximately two years and had engaged in a long-distance relationship via the telephone. On June 23, 1996, the appellant and Etta Mae Aldridge were married. Two weeks later, Etta's children joined her in Tennessee. By August that same year, the couple began experiencing marital problems. The couple separated and Etta went to Arkansas to live with relatives. On October 20, 1996, Etta returned to Tennessee to reconcile with the appellant.

On November 1, 1996, the appellant and Etta traveled to their respective places of employment together, they shared lunch, and returned home together that evening. The appellant was in a good mood and everything seemed "fine" at dinner. During their meal, the appellant asked Etta if she had an affair while she was living in Arkansas. Etta denied any extramarital liaison. Her denial infuriated the appellant who overturned the dinner table and backhanded Etta across the face. He called her a "bitch" and a "liar." The appellant forced Etta into the couple's bedroom, where he disrobed. He then "doubled" his leather belt and began beating Etta upon her legs. While being beaten, he informed her that "he was gonna teach [her] to lie and to cheat." When the appellant finally ceased his beating, he observed the bruises he had inflicted on his wife. He apologized to her, told her he loved her, and informed her that he would never hurt her again. The couple later engaged in sexual intercourse.

On November 15, 1996, Etta picked up her final paycheck from her former employer and completed some errands. She then picked up the appellant from his place of employment later that afternoon. On the drive home, the appellant started

3

yelling at Etta about spending her paycheck. The topic then changed from money to "the guys from Arkansas that [Etta] supposedly had an affair with." Although she, again, denied the allegation, the appellant "backhanded" her in the face. He then instructed her to drive onto a dirt road. Etta pleaded with the appellant not to hurt her. He responded that "[they] were going to settle it once and for all." Etta stopped the vehicle and obeyed the appellant's command to "get out" of the car. The appellant then "started hitting [her] with his fist double handed." The hitting was followed with a beating with his belt. He threatened that "he felt like just killing [her] and throwing [her] into the river." Etta begged him to stop for the sake of the children. The appellant then instructed Etta to get in the passenger side of the car. Still enraged, he then drove to another location. He stopped the car and again ordered her out of the car. "[H]e beat [her] some more," threw her on the hood of the car, and began to choke her. He exclaimed that "he wanted the truth and if [she] wasn't going to tell the truth, he was going to beat it out of [her]." The appellant wrapped his belt around her neck and started choking her. When he released his hold, Etta fell to the ground. He then placed his hand in his pocket and told Etta that "he felt like putting a bullet in [her] head." The appellant's anger subsided and he told Etta to get back in the car. On the way home, however, he again backhanded her, giving her a "bloody nose." The victim suffered two black eyes, a bloody nose, and a swollen lip from this incident.

On Thanksgiving Day, Etta decided to leave the appellant. That evening, she left their home and, accompanied by her children, went to a motel. The following day, she went to a women's shelter. The Hickman County Sheriff's Department was informed of the November 1 and November 15 assaults and charges were filed against the appellant. Sometime during the month of December, Etta contacted an attorney to initiate divorce proceedings against the appellant. On December 9, 1996, an order of protection issued from the Hickman County General Sessions Court enjoining the appellant from abusing, threatening to abuse, or committing any

4

acts of violence upon Etta. Despite this order of protection, Etta encountered the appellant at the home of a mutual friend, Peggy Mitchell, during the early part of January. The appellant told Etta that "he started wanting to be with [her] again" and that he was "sorry and that [they] could work things out." Consequently, Etta "went with him to his home where [they] made love that night."

On January 14, 1997, Etta Mae Aldridge filed a complaint of divorce in the Hickman County Chancery Court alleging irreconcilable differences and inappropriate marital conduct. The complaint alleged that the couple last resided in the same household on November 28, 1996.

Between 11:00 and 12:00 p.m. on January 18, the appellant arrived at Etta's apartment wanting to talk with her. The appellant attempted to persuade Etta to leave the apartment with him so they could talk in private. Etta resisted. The appellant then quietly warned her that if she did not accompany him, "he would shoot [her] and then [her] kids." Etta retrieved her coat and told her twenty-one year old daughter Dawn to dial "911." It was later revealed that Dawn did not place the telephone call until the following morning.[4]

On the way to the appellant's house, he reminded Etta that he had previously warned her, "if he didn't get to take Cindy home with him on Wednesday,"[5] "[Etta's] life wouldn't be worth two cents." Etta pleaded for him not to harm her. He responded, "Oh, I'm not going to hurt you, I'm going to kill you." He added that "he would give [her] two choices, either a .357 or a .44." Shortly thereafter, they arrived

---

[4]The victim's daughter, Dawn, was subpoenaed for trial. The subpoena was never served as she could not be located. In her absence, the proof developed at trial indicated that Dawn had been involved in a sexual relationship with the appellant. Indeed, the victim testified that the appellant had told her that she was better in bed than her daughter. Testimony also revealed that the appellant was engaged in promoting Dawn and another female for purposes of prostitution at a local truck stop.

[5]"Cindy" is the appellant's daughter from his first marriage. His first wife is deceased and his daughter was in the custody of her stepfather and his present wife. Custody hearings were proceeding due to allegations that Cindy's stepfather abused her.

at the appellant's house and went inside.  The appellant then advised Etta that "[they] could do it [her] way or his way" and he began questioning her about her affairs in Arkansas.  When she denied having an affair, he hit her in the face.

> And then he grabbed [her] . . . by the arm, then we went into the bedroom and he shut the door, and I tried to grab a statue and it fell out of my hand, and then he grabbed me by this arm and he picked me up and he shoved me against the wall.  Then he took his hand and he choked me and I started fighting him back, I started kicking and fighting him back, and then I fell to the floor and he started choking me some more and I started kicking him trying to get him off of me.

> And then he picked me up and he threw me across the bed and I hit a night stand and I cut my ear, and I knocked over the night stand and a lamp and broke it and he told me to sit it back up, so I did.  And then he - - - grabbed me again and he told me to take off my clothes, so I took them off and we went into the bathroom and the water pipes had broken, so he raised the back of the toilet and he dipped a towel and he washed my face . . . and I thought maybe he wasn't going to hurt me anymore.

> . . .And then we went back into the bedroom and he started hitting me again and he threw me on the bed and he started choking me, so I scratched him and he let go, and then he kept holding me down and I twisted his penis and he ripped my underwear at the same time.
> . . .
> He forcibly had [vaginal] sex with me.  I told him no, but he did anyway.
> . . .
> He made me roll over and he put some liquid, it smelled like cherries, on me and he [put it] . . . on my anal area.
> . . .
> And then he had forced sex with me there.
> . . .
> I asked him to quit and he wouldn't.  I kept trying to get away, but I couldn't.
> . . .
> It hurt.  I can't describe how bad it hurt.
> . . .
> He told me that all white trash, white whores liked it.
> . . .
> I got dressed, he said he wanted to go to a friend's house . . . to Peggy Mitchell's house[6] . . . .  We went there because Gary said he wanted to have a threesome and that she liked women.  So when we got there Gary sat in the recliner. . . .

> So Gary pulled me down in his lap and he raised my denim skirt. . . I had on high knee boots . . .and he didn't let me put my underwear back on.
> . . .
> And he pulled my skirt up and he showed Peggy - - and he asked her how would she like to get a hold of that.

---

[6]Testimony at trial indicated that Peggy Mitchell and the appellant enjoyed an intermittent sexual relationship throughout most of their adult lives.

6

. . .
[Peggy responded] 'It looks real good, Gary, but I don't think so tonight. I don't feel well.' So Gary put my skirt back down. . . . we left.
. . .
[When we got back to his house] [w]e had sex again. . . .

. . .[H]e wanted to have oral sex.
. . .
I didn't want to do anything with him. I just wanted to go home.
. . .
We had vaginal sex and then we went to sleep.

The next morning, the appellant told Etta he loved her and that he was sorry. The couple then "just made love again."[7] He asked her if she wanted to stay at the house with him. She declined his offer. Later, the appellant warned Etta that if she told anyone about what happened he would beat her and then kill her. Early the next afternoon, before returning her home, the appellant told Etta that he was "proud of her because she had put up a good fight."

## I. Sufficiency of the Evidence

In his first issue, the appellant contends that the evidence is not sufficient to sustain his convictions for aggravated rape (counts 4 and 5) and rape (count 7).[8] Specifically, he argues:

(1) the testimony of Etta Aldridge was not credible because she consistently sought reunion with the appellant after episodes of physical abuse;

(2) the evidence presented shows that, based on the nature of his marital relationship with the victim, the incidents of sexual penetration were consensual; and

---

[7]Although this final act of sexual intercourse was not charged as a rape, Etta testified at trial that she did not consent to this act. Rather, she explained that "I just wanted the whole thing to be over with. I knew that he wasn't going to kill me then, but I didn't want to be beaten again either."

[8]The two incidents forming the bases of the appellant's convictions for aggravated rape are the first act of vaginal penetration following the victim's initial beating (count 4) and the ensuing act of anal penetration (count 5). The second episode of vaginal intercourse, which occurred upon the appellant and Etta's return from the residence of Peggy Mitchell, is the basis for the rape in count 7.

> (3) the second act of vaginal penetration forming the basis of his conviction for rape was "*completely* unaccompanied by threat of force or coercion and should not be considered an act of rape."

Finding them to be without merit, we reject the appellant's contentions.

When reviewing a trial court's judgment, the appellate court will not disturb a verdict of guilt unless the facts of the record and inferences which may be drawn from it are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). In other words, this court will not reevaluate or reweigh the evidence brought out at trial. It is presumed that the judge or jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn.1973). Since a verdict of guilt removes the presumption of a defendant's innocence and replaces it with a presumption of guilt, the defendant has the burden of proof on the sufficiency of the evidence at the appellate level. Grace, 493 S.W.2d at 476.

We in turn review the appellant's first contention challenging the credibility of Etta Aldridge. Specifically, the appellant argues that her testimony is not believable because, even after his initial assaults against her in November 1996, "Etta continued to seek reunion with Gary. Such behavior does nothing to strengthen the portrayal of those assaults offered by Etta at trial." In essence, the appellant requests that this court trespass upon the jury's responsibility to evaluate the credibility of the witnesses and reweigh the evidence introduced at the trial by reassessing the credibility of the victim, Etta Aldridge. It is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. See generally State v. Adkins, 786 S.W.2d 642, 646 (Tenn. 1990); State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993);

8

State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.1990). We decline the appellant's invitation to overturn his convictions by making a choice different from that of the jury.

Next, the appellant contends that "Etta's testimony depict[ing] an incredible pattern [of] immediate forgiveness of acts of violence followed [by] voluntary sexual relations" precluded the jury from concluding that acts of sexual penetration were non-consensual. Additionally, the appellant specifically challenges his conviction for the spousal sex offense of rape, arguing that, unlike the acts supporting his convictions for aggravated rape, this act of intercourse was "*completely* unaccompanied by threat of force or coercion and should not be considered an act of rape." (emphasis in original). He adds that, "[i]f it were rape then Gary Aldridge could be prosecuted for *every* occasion upon which he and Etta 'made love.'" (emphasis in original).

Rape, as charged herein, is "the unlawful sexual penetration [by force or coercion] of one spouse by the other where . . .[t]he spouses are living apart and one (1) of them has filed for separate maintenance or divorce." See Tenn. Code Ann. §§ 39-13-503(a)(1); -507(b)(1)(C). As charged in counts 4 and 5, aggravated rape requires the additional element of causing bodily injury to the victim.[9] See Tenn. Code Ann. §§ 39-13-502(a)(2); -503(a)(1); -507(b)(1)(C).

The undisputed proof shows that the victim and the appellant had been living apart since November 28, 1996, and that the victim had filed for divorce on January 14, 1997. See Tenn. Code Ann. § 39-13-507(b)(1)(C). Additionally, the appellant does not deny the three acts of sexual penetration, both vaginally and anally. See Tenn. Code Ann. §§ 39-13-502(a); -503(a); 507(b)(1). Finally, he concedes that

---

[9]The term "bodily injury" includes "a cut, abrasion, bruise, burn or disfigurement; physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." See Tenn. Code Ann. § 39-11-106(a)(2) (1996 Supp.).

9

infliction of bodily injury to the victim accompanied the acts of sexual penetration in counts 4 and 5. See Tenn. Code Ann. § 39-13-502(a)(2); see also State v. Locke, 771 S.W.2d 132, 136 (Tenn. Crim. App. 1988) (phrase "accompanied by bodily injury" intended to encompass acts committed in association with the unlawful sexual penetration, whether the acts occur before, during or after the actual sexual penetration).

Thus, the only disputed fact is the "unlawful" nature of the three incidents of sexual penetration.[10] Although the appellant's presentation of the issues is clouded by his waffling argument, in essence, the appellant contends that, notwithstanding the filing of divorce, Etta's consent to sexual relations with the appellant continued due to the established pattern of consensual sex following episodes of physical abuse. Moreover, as additional fodder to his challenge to his rape conviction in count 7, he argues that the State failed to show that he perpetrated the vaginal penetration with force or coercion.

The spousal exclusion set forth in Tenn. Code Ann. § 39-13-507(a), excludes a person from culpability in committing a sexual offense contained in Tenn. Code Ann. § 39-13-501 *et seq.,* if the victim is his or her legal spouse. In those jurisdictions which have retained the common law tenet of spousal immunity, it is said that "the marriage constitutes a blanket consent to sexual intimacy which the woman may revoke only by dissolving the marital relationship." Comments, MODEL PENAL CODE § 213.1(8)(c) (1980). Although Tennessee has codified the common law defense of spousal exclusion, exceptions have been carved out of this *per se* consent to the sexual misconduct of one's spouse. See generally Tenn. Code Ann. § 39-13-507(a)-(c). For example, as in the present case, where the parties are

---

[10]The term "unlawful" may generally refer to non-consensual acts. See generally State v. Jones, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994); cf. State v. Barney, No. 01C01-9509-CR-00317 (Tenn. Crim. App. at Nashville, Jul. 23, 1997) (Peay, J., dissenting), *judgment aff'd on other grounds by*, 986 S.W.2d 545 (Tenn. 1999) (term "unlawful sexual penetration" is sufficient only to allege a non-consensual intrusion by the defendant").

"living apart" and one of them has "filed for separate maintenance or divorce," a person is liable for all of the rape and sex offenses to the same extent as if the victim were not his/her spouse.[11] See Tenn. Code Ann. § 39-13-507(b)(1)(C). Indeed, it is important to draw a line somewhere when extending the presumption of marital consent. Obviously, the filing of divorce signals the end of consensual sexual relations within the marital relationship so as to exclude it from the reasoning behind the spousal exclusion. See generally Comments, MODEL PENAL CODE §§ 213.1(8)(C); 213.6(3).

The appellant asserts that his and Etta's marital relationship included incidents of physical abuse immediately followed by forgiveness and sexual intercourse. The appellant's supposition that the nature of their marital relationship imputes the victim's consent upon his acts of forced sexual penetration is devoid of reason, an insult to the institution of marriage, and generally, an indignity to all women. We find the same to be true of his assertion that, because his wife did not physically resist and acquiesced in his endeavor, the second act of vaginal penetration, the basis for count 7, cannot constitute a rape because it was unaccompanied by force.

Rape is a truly violent and reprehensible crime. Even when accomplished behind the veil of a marriage license, it is a crime of violence not only damaging to the body, but scarring upon the mind. DeStefano, 467 N.Y.S.2d at 512. Even though the appellant and Etta were still legally married, the appellant cannot hide behind the antiquated assumption of implied consent by a spouse. The couple had been living separate since November 28, 1996, and Etta filed for divorce on January 14, 1997. Our legislature has determined that, at this point, the wife's implied consent is dissolved. The nature of their marital relationship prior to the couple's

_____

[11]A person, legally married to the victim and not "living separate," may commit rape upon his legal spouse if "the defendant is armed with a weapon . . ." or "the defendant causes serious bodily injury to the victim." See Tenn. Code Ann. § 39-13-507(b)(1)(A) & (B).

11

separation is irrelevant in establishing the non-consensual nature of the incidents presently before this court. Moreover, the appellant's physical abuse of the victim, both during their marital relationship and accompanying the acts of forced sexual penetration in counts 4 and 5, indicates that Etta had a reason to fear the appellant and that her acquiescence was out of fear of further beatings. During their brief marriage, Etta endured the position of one who was controlled, terrorized, and intimidated by a combination of the appellant's abusive tactics and threats. Clearly, a reasonable juror could conclude that the sexual intercourse in question was accomplished by conduct that was tantamount to force or coercion. Accordingly, we conclude that the evidence at trial is more than sufficient to establish the elements of both rape committed as an exception to the spousal exclusion and aggravated rape committed as an exception to the spousal exclusion. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). This issue is without merit.

## II. Consecutive Sentences

The trial court imposed an effective penitentiary sentence of sixty years. Pursuant to the provisions of Tenn. Code Ann. §§ 39-13-523 (1996 Supp.) and 40-35-501(i)(2) (1996 Supp.), the appellant will be required to serve the entire sentence imposed without any reductions or credits. Accordingly, he contends that, although the crimes for which he was convicted are unquestionably serious, "th[e]se crimes do not justify a *de facto* sentence of life without the possibility of parole." Specifically, the appellant challenges the trial court's imposition of consecutive sentences as being premised, not upon recognized principles of consecutive sentencing, but upon the "trial court's disdain for Mr. Aldridge as a human being."[12]

---

[12]We acknowledge that the appellant captions this issue as "The appellant's sentence is grossly disproportionate to his crimes." However, in support of this allegation, he relies on law applicable to the consecutive sentences imposed, rather than asserting principles of law relevant to an Eighth Amendment challenge. Accordingly, we proceed to review this final issue under

At the conclusion of the sentencing hearing, the trial court found the appellant to be a dangerous offender under Tenn. Code Ann. § 40-35-115(b)(4)(1990),[13] and that the appellant has "a record of criminal activity that's extensive," under Tenn. Code Ann. § 40-35-115(b)(2). Furthermore, in imposing consecutive sentences for counts 4, 5, 7, 9, and 10, the trial court determined "[this] is a sentence that is very justly deserved in relation to the seriousness of these offenses and that it is appropriate and adequate. . . ."

In finding consecutive sentences warranted, the trial court considered the appellant's prior criminal record, including a prior conviction for "crime against nature involving the molestation of his step-daughter," the psychological impact the offenses have had upon the victim; the severity of the physical abuse inflicted upon the victim; and evidence of prior incidents of the appellant's maltreatment of women, including, an attempted sexual assault on a friend's pregnant girlfriend, the physical abuse and sexual assault of his second wife, and the sexual molestation of his stepdaughter. Additionally, the trial court considered the testimony of the appellant. Specifically, the appellant blamed his "marital problems" on Etta, stating that she complained "about not being able to afford the things she wanted." He added that "[s]he made a lot of accusations that are untrue," including her denial of an affair while in Arkansas. In repudiation of the allegations of his prior abuse of women, the appellant explained to the court that "[m]y opinion of it is my first wife wanted a divorce, she wanted the children, and that's why the accusations were made. Since that time its been like a snowball rolling downhill." Moreover, in a somewhat similar

Wilkerson. Nonetheless, we conclude that an effective sixty year sentence is not grossly disproportionate to the crimes for which he has been convicted so as to constitute cruel and unusual punishment under the Eighth Amendment of the United States Constitution or Article I, Section 16 of the Tennessee Constitution. See State v. Harris, 844 S.W.2d 601, 603 (Tenn. 1992).

[13]The trial court stated: "His behavior indicates little or no regard for human life, no hesitation about committing a crime in which the risk to human life is high, Aggravated kidnapping, any form of spousal rape, are all crimes in which risk to human life is high, in which in this case bodily injury was actually inflicted. And I think they all indicate a lack of any respect for life, a lack of any respect for the person who at some point, presumably, Mr. Aldridge promised to love, honor, and cherish until death do us part. He has gone just as far as a human being possibly can to dishonor those vows or any other responsibility to a spouse that one can."

vein reflecting total indifference for his actions, we note the appellant's comments following his incarceration, which were overheard by a correctional officer, that he just "gave the bitch what she asked for."

This court's review of the manner of service of a sentence is *de novo* with a presumption that the determination made by the trial court is correct. Tenn. Code Ann. § 40-35-401(d) (1990). See also State v. Bingham, 910 S.W.2d 448 (Tenn. Crim. App.), perm. to appeal denied, (Tenn.1995). This presumption is only applicable if the record demonstrates that the trial court properly considered relevant sentencing principles. State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). We agree with the State's observation that "the trial court in this case addressed sentencing in an uncommonly thorough and meticulous manner." Accordingly, as conceded by the appellant, the presumption of correctness applies to the court's decision. Moreover, the appellant bears the burden of proving the impropriety of the consecutive nature of the sentences imposed in this case. Sentencing Commission Comments, Tenn. Code Ann. § 40-35-401(d).

While consecutive sentences should not be routinely imposed, Sentencing Commission Comments, Tenn Code Ann. § 40-35-115, Gray v. State, 538 S.W.2d 391, 393 (Tenn. 1976), when one or more statutory criteria are present, the imposition of consecutive sentences is within the discretion of the trial court. State v. Taylor, 739 S.W.2d 227, 228 (Tenn. 1987); Sentencing Commission Comments, Tenn. Code Ann. §40-35-115. A finding by the trial court that one of these factors exists is not alone sufficient to justify the imposition of consecutive sentences. "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995). Notwithstanding proof of these three criterion, a sentencing court retains the discretion of imposing consecutive sentences. On appeal, the exercise

of the trial court's discretion is afforded great weight, provided the court correctly applied the principles of consecutive sentencing.  Moreover, in determining whether the trial court providently exercised its discretion, "the overriding concern" is the fairness of the resulting sentence under all the circumstances.

Upon *de novo* review, we conclude that the imposition of consecutive sentences is appropriate.  Although not disputed on appeal by the appellant, the record supports the trial court's findings regarding the appellant's classification as both a dangerous offender and a multiple offender.  Moreover, we find, based on the evidence presented and the trial court's findings, that the aggregate sentences are reasonably related to the severity of the offenses and that an extended sentence is necessary to protect the public from further criminal acts of the appellant. The appellant has failed to establish that the trial court abused its discretion in ordering consecutive sentences.  Thus, we conclude that consecutive sentences are warranted in the present case.

For the foregoing reasons, the judgments of conviction and sentences entered by the trial court are affirmed.

_____
_____DAVID G. HAYES. Judge


CONCUR:


_____
JERRY L. SMITH, Judge


_____
NORMA MCGEE OGLE, Judge