STATE of Tennessee, Appellee,

v.

Donald Wayne BURLISON, Appellant.

Court of Criminal Appeals of Tennessee, at Nashville.

April 29, 1993.

Thomas T. Woodall, Dickson, for appellant.

Charles W. Burson, Atty. Gen., Merrilyn Feirman, Asst. Atty. Gen. of Tennessee, Nashville, Joseph D. Baugh, Jr., Dist. Atty. Gen., Franklin, and Don Schwendimann, and Timothy Easter, Dist. Attys. Gen., Hohenwald, for appellee.

## OPINION

TIPTON, Judge.

The defendant, Donald Wayne Burlison, was convicted by a jury in the Hickman County Circuit Court of first degree murder and aggravated assault. He was sentenced to concurrent terms of life and three years in prison. In this appeal as of right, he contends the following:

(1) The evidence was insufficient to prove the element of premeditation, which is necessary to convict for first degree murder, beyond a reasonable doubt.

(2) The trial court erred in refusing to grant a new trial as the thirteenth juror under Tenn.R.Crim.P. 33(f).

(3) The convictions for both murder and aggravated assault violate the defendant's right against double jeopardy.

(4) The trial court erred in allowing witnesses to testify about statements made by either the defendant or a codefendant when the witnesses could not specify which person made the statements.

The defendant, Darrell "Ho" Daniels and Timmy Daniels were charged with and tried for the aggravated assault and first degree murder of James K. Baker. Darrell Daniels' case resulted in a mistrial because of the necessity for a severance and Timmy Daniels was acquitted of the charges. The events in issue began on November 15, 1990, in the area of the Pat Lusk and David Daniels homes, which are adjacent, but separated by a small hollow with trees. The victim and Johnny Daniels (David's brother) lived with Pat Lusk. Darrell and Timmy Daniels lived with David, their father. The record reflects that the defendant was a friend of the Daniels family.

Around dusk, Timmy and Mooch Daniels, Darrell and Timmy's young nephew, were in the Lusk home when the victim apparently kicked Mooch in the face. Timmy and Mooch went home and the victim was told to leave the Lusk home, which he did. The defendant, Darrell Daniels, Terry Tidwell and Jimmy Dorton returned from deer hunting and learned what happened from Timmy.

Dorton testified that the defendant and Darrell Daniels looked for the victim and began shooting guns into the woods between the two houses in order to scare the victim out of the woods. He said that the victim emerged and he saw the defendant, Darrell and Timmy kicking the victim and beating him with their fists and with guns. He stat-

ed that the fighting stopped and the victim left in his car. The defendant and Darrell followed the victim in Darrell's truck. Dorton testified that both of them had guns. He said the two were gone four to five minutes and were laughing and talking when they returned. Initially, Dorton testified that "they" stated that "he might not go back and tell the law what they done to him." On cross-examination, Dorton indicated that it was Darrell who said that the victim "might not be able to tell the law what happened."

Johnny Daniels testified that after the victim had kicked Mooch, Johnny went to see if Mooch had been hurt. While he was at the Daniels house he heard shots being fired. When he was returning to the Lusk house, he encountered the victim who swung an ax at him. Johnny caught the ax, a scuffle ensued, and the two of them fell to the ground. Johnny called out for help.

Johnny testified that Timmy knocked the victim off him and that the defendant and Darrell arrived. He said that the victim and Darrell fought and that Darrell was on top. When Darrell started to get up, the victim kicked him between the legs. Johnny said that Darrell hit the victim with a gun several times, at least once in the head. He stated that, to this point, the defendant had done nothing to the victim. However, the victim got up and "jumped" the defendant, after which the defendant hit the victim with the rifle two or three times but Johnny was unsure where.

Johnny stated that his brother, David, appeared and told the victim to get his car and leave. The victim apparently lost his keys and Johnny and the others went around the yard looking for them. Ultimately, the victim retrieved a spare set of keys from the Lusk home and left. Johnny stated that the victim had an injury above his eye, but it was hard to see if there were any other injuries. He acknowledged that the victim was able to walk around and talk.

Darrell and the defendant then left in Darrell's truck. Johnny indicated that they were gone approximately ten to twelve minutes. Upon their return, the two were side by side. Johnny said he heard "one" say that the "sights was on or the sights was true," but he did not know which one made this statement. Johnny testified that he also heard one of them, again not knowing which one, say something about "got him off the road, or knocked him off the road, or something about off the road" and something about "shut his mouth or won't be talking, or something to that nature."

Johnny testified that he did not recall the defendant and Darrell having guns in their possession when they returned. He stated that he and Tidwell got into a car and drove down Bear Creek Road out to the highway. He said they looked for the victim's car, thinking it was in a ditch, but they never found it.

Terry Tidwell testified about the events. He said that he recalled, before the ax incident, Darrell had the victim's shotgun, which the victim carried all the time, and Darrell stated that the victim hit him with the butt of the gun and almost broke his jaw. Darrell said that he took the gun away from the victim. Tidwell later saw Darrell hitting the victim, who was on the ground, two or three times with the shotgun. He believed that it was in the head, but he was not sure. Tidwell stated that the victim did not act as if he was hurt, but was walking and talking.

Tidwell testified that he did not see the defendant strike the victim. However, before the victim left, Tidwell saw the defendant poke his gun into the victim and tell him to leave. Tidwell stated that Dorton remained in Tidwell's car through most of the events.

Tidwell stated that the defendant and Darrell left and he saw them return in Darrell's truck near Tidwell's car. Tidwell said that the two got out of the truck and the defendant patted his gun and said, "The sights are on." Tidwell said that he also heard "somebody" say, "He's not going to be able to testify," or something of that nature.

The evidence showed that the victim drove his car to Earline's Tavern, actually hitting the structure when he stopped. He entered the establishment and sat on a bar stool. One witness testified that the victim was all bloody with his eyes and nose swollen and that his face looked "like a piece of meat."

She said that the victim fell off the stool and was lying on the floor when Earline cleaned his face.

Hickman County Sheriff's Deputy Jerry Simmons testified that he was dispatched to Earline's Tavern and found the victim on the floor. He said he saw cuts, scrapes and bruises on the victim and he could smell alcohol. He talked with the victim, but the victim was incoherent. Simmons stated that he did not think the victim was in as bad a shape as he apparently was. The victim was taken to a hospital and he died five days later.

Simmons knew the victim and went to the Lusk home. Then he went to the Daniels home and arrested Timmy and Darrell for aggravated assault. He said that Darrell put on a shirt which had blood on it. Timmy admitted hitting the victim a couple of times and leaving him on his knees. Darrell stated that he had "fired up" the victim, which Simmons testified was street slang for beating the victim.

The next morning Simmons tracked pieces of tire along the highway back to half way up Dean's Switch Road, which is toward Bear Creek Road. He said he followed rim marks as well. He stated that he located where two vehicles slid to a stop. Also, he testified that there was damage to Darrell's truck and the victim's car. Simmons testified that the flat tire marks started about one and one-half to one and three-quarters mile from the Daniels house. Further, he stated that it was approximately eight and one-half miles from where the flat tire marks started to Earline's Tavern.

Doctor Charles W. Harlan, a pathologist, testified that he found a skull fracture which extended from one side of the head to the other. He found internal bleeding consistent with the victim having lived for approximately five days after the injury. He testified that death occurred as the result of blunt trauma to the head caused by a single blow with a long object, such as, a bat, metal pipe, or shotgun. Specifically, it was the hemorrhaging and the swelling of the brain resulting from the blow that caused the death. Dr. Harlan acknowledged that the victim received multiple blows to the head, but he stated that the others were not fatal. The fatal blow was described as being in an area covered by hair. He found no bullet or gunshot wounds.

Dr. Harlan testified that the skull was cracked, but not indented which would require a greater force. Further, he acknowledged that it was possible that the victim could have received the fatal blow and then "got up off the ground and dusted leaves out of his hair and looked around and got his keys, got in his car, backed out and driven between three and a half and five miles, get out of his car and walk in a bar, ask for a glass of water and collapse." The bleeding and pressure which resulted in death would increase over time.

Greg Proctor testified that he was in jail on a DUI charge when the defendant was in jail. The defendant said that he was charged with murder and that "[w]e beat somebody to death." The defendant said that he, Timmy and Darrell Daniels had gotten into a fight with someone who died. Proctor stated that the defendant explained the murder charge in terms of "it's more to the effect that the three of us jumped on him and he got in his car and left. And after he got in his car and left, me and Ho we followed him. And when we went down the road the second time, we ended up having to run him off the road and we beat him again. I guess that's what finished him." Proctor testified that the defendant stated that he and the victim had been into it before.

I

The defendant contends that there was insufficient evidence to justify the conclusion beyond a reasonable doubt that the killing was premeditated. T.C.A. § 39–13–202(a)(1) provides that the "intentional, premeditated and deliberate killing of another" is first degree murder. Under T.C.A. § 39–13–201(b)(2), a premeditated act includes "one done after the exercise of reflection and judgment." As is usually the case, a determination of a culpable mental state, such as premeditation, must be inferentially made from the circumstances surrounding the killing. *Bass v. State*, 191 Tenn. 259, 231

S.W.2d 707 (1950); *Taylor v. State,* 506 S.W.2d 175, 178 (Tenn.Crim.App.1973). Absent an appropriate evidentiary basis to support the conclusion that premeditation existed, a conviction for first degree murder may not be sustained.

▇▇▇ When the sufficiency of the evidence is challenged, the standard for review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Duncan,* 698 S.W.2d 63, 67 (Tenn.1985), *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1240, 89 L.Ed.2d 348 (1986). A conviction which is approved by the trial court accredits the testimony which favors the state and resolves all conflicts in favor of the state's theory. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983), *cert. denied,* 465 U.S. 1073, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984).

▇▇▇ In *State v. Brown,* 836 S.W.2d 530, 542 (Tenn.1992), our Supreme Court stated that repeated blows, by themselves, would not sufficiently support a conclusion that a killing was premeditated. However, it noted that other circumstances, such as, a declared intent to kill or use of a deadly weapon, were relevant to premeditation. *Id.* at 541.

In this case, in the light most favorable to the state, the evidence reflects that the defendant and Darrell Daniels, armed with a rifle and shotgun, went after the victim and ran him off the road. Another beating, with greater force than the first, was administered to the victim. Upon their return to the Daniels home, one of them stated to the effect that the victim would not be talking to the police. This evidence was sufficient for the jury to have concluded that the defendant, for himself and as an aider of Darrell Daniels, acted with the premeditated intent to kill at the time of the second beating in order to silence the victim.

## II

The defendant contends that the trial court erred by denying him a new trial in its capacity as the thirteenth juror. Rule 33(f), Tenn.R.Crim.P., provides that the trial court may grant a new trial if it views the verdict to be contrary to the weight of the evidence.

Historically, the trial court's approval of the verdict under the thirteenth juror rule was a necessary prerequisite to the imposition of a valid judgment. *See Curran v. State,* 157 Tenn. 7, 4 S.W.2d 957, 958 (1928). However, in *State v. Cabbage,* 571 S.W.2d 832 (Tenn.1978), our Supreme Court abandoned the thirteenth juror rule and provided that the only review of the evidence to be made was whether it was legally sufficient to convict when viewed in the light most favorable to the prosecution. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). After *Cabbage,* the trial court's approval of the verdict required only a determination of the legal sufficiency of the evidence to support the verdict. *See State v. Johnson,* 692 S.W.2d 412, 414 (Tenn.1985).

▇▇▇ The promulgation of Rule 33(f) constituted a reinstatement of the trial court's role as a thirteenth juror in assessing the propriety of a jury verdict. Thus, it is logical to conclude that such an assessment, again, is a prerequisite of a valid judgment. In this regard, the question raised by the defendant's contention is what authority an appellate court has to function as a thirteenth juror or to review a trial court's action as the thirteenth juror.

▇▇▇ Pursuant to T.R.A.P. 13(e), our scope of review of the evidence is to determine whether it "is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." As the Advisory Commission Comments indicate, this standard relates to the legal sufficiency of the evidence, which results in an acquittal if found to be insufficient. Under such a circumstance, double jeopardy would bar a retrial. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978). Also, T.R.A.P. 36(a), dealing with the relief available on appeal, provides that relief should be granted "on the law and facts to which the party is entitled or the proceeding otherwise requires and may grant any relief, including the giving of any judgment and making of any order; *provid-*

*ed, however, relief may not be granted in contravention of the province of the trier of fact."* (Emphasis added). Thus, appellate review of the sufficiency of the evidence in a criminal case is limited.[1]

We recognize that other jurisdictions have provided for appellate courts to exercise the role of the thirteenth juror. *See Tibbs v. Florida,* 457 U.S. 31, 36, 102 S.Ct. 2211, 2215, 72 L.Ed.2d 652 (1982) (Florida rule allows the appellate court, in capital cases, to "review the evidence to determine if the interests of justice require a new trial.") However, no similar rule exists in Tennessee while criminal procedural rule 33(f) mentions only the trial court. This Court concludes that it has no independent authority to act as a thirteenth juror.

▇▇▇ The fact that this court has no independent authority to function as a thirteenth juror does not negate the obligation to review the trial court's action under Rule 33(f) for error. Thus, if the record reflects that the trial court disagrees with the verdict or otherwise expresses its dissatisfaction with the verdict, given its view of the weight of the evidence, the appellate courts have consistently held that it is error for the trial court to refuse to grant a new trial. *See, e.g., Helton v. State,* 547 S.W.2d 564, 566 (Tenn. 1977); *Halliburton v. State,* 1 Tenn.Crim. App. 39, 428 S.W.2d 41 (1967); *Messer v. State,* 215 Tenn. 248, 385 S.W.2d 98 (1964). Also, a new trial may be granted on appeal in circumstances in which the trial court absolved itself of its responsibility to consider the evidence as a thirteenth juror. *Curran v. State,* 4 S.W.2d at 958. The reasoning in the preceding cases is that dissatisfaction with the verdict in terms of the weight of the evidence or the failure to assess the propriety of the verdict in such terms results in the trial court's inability to give proper approval

to the verdict so as to allow for entry of a valid judgment.

▇▇▇ On the other hand, once the trial court approves the verdict as the thirteenth juror and imposes judgment, the review of the evidence on appeal is quite limited, requiring the accrediting of the testimony of the witnesses for the state and the resolution of evidentiary conflicts in favor of the state. *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973).

'This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.'

*State v. Cabbage,* 571 S.W.2d at 835, quoting *Bolin v. State,* 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966). These limits presently existing for appellate review, by which this Court is effectively precluded from reevaluating or reweighing the evidence, practically foreclose assessment of the evidentiary basis for a trial court's thirteenth juror ruling.

▇▇▇ In this case, the record reflects that the trial court considered the evidence in its role of the thirteenth juror and denied the defendant's request for a new trial.[2] The defendant's sole contention is that the weight of the evidence is contrary to the verdict of first degree murder, a position with which the trial court disagreed. Upon the record reflecting that the trial court fulfilled its obligation under Rule 33(f), this Court may not overturn its decision on appeal.

1. In *State v. Johnson,* 692 S.W.2d at 413, our Supreme Court refused to reinstate the thirteenth juror rule at a time when the appellate rules were in effect. Obviously, it did not consider the rules to have any bearing on the issue.

2. This Court does not hold that the record must always reflect the trial court's consideration and determination of the weight of the evidence or reflect the reasons for its ultimate decision in approving a verdict. We may presume that the

trial court approves the verdict by its denying the motion for new trial and imposing judgment. *See Halliburton v. State,* 428 S.W.2d at 44; *Messer v. State,* 385 S.W.2d at 101. However, as these cases point out, if the record reflects that the trial court denied a new trial while disapproving of a verdict or refusing to consider the evidence as the thirteenth juror, this Court may grant appropriate relief.

## III

Next, the defendant contends that his right against double jeopardy bars his being convicted for both murder and aggravated assault. He argues that the state proved the essential elements of first degree murder by proving the aggravated assault and that the aggravated assault was a lesser included offense to the murder. This Court disagrees under the facts in this case.

The Double Jeopardy Clause contains three protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). In cases involving multiple convictions and punishments in a single prosecution, such as this case, the issue is viewed in terms of whether or not the legislature clearly intended that multiple or cumulative sentencing could be imposed for the conduct in issue. *Missouri v. Hunter*, 459 U.S. 359, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983); *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Pryor v. Rose*, 724 F.2d 525 (6th Cir.1984).

However, such an analysis presupposes that the same conduct proved both offenses in issue. Thus, if the evidence showing one offense is separate and distinct from the evidence showing the other offense, then there is no need to analyze the similarity of the offenses or their lesser included quality, or to determine whether or not the legislature clearly intended to impose separate punishment for separate offenses originating from the same conduct. *See, e.g., Brown v. State*, 574 S.W.2d 57, 62 (Tenn.Crim.App. 1978); *Cherry v. State*, 539 S.W.2d 51 (Tenn. Crim.App.1976).

Unquestionably, the evidence in this case reflects that the victim was the subject of two separate assaults. The record reflects that death resulted from a single blow—a circumstance which, by itself, negates any risk that the jury concluded that the murder resulted from both assaults. It is apparent that each conviction rests upon wholly separate conduct by the defendant and the evidence sufficiently warrants the conclusion that the defendant was guilty of aggravated assault based upon the first beating and of murder based upon the second beating.[3] There is no double jeopardy problem in this case.

## IV

Finally, the defendant contends that it was error for the trial court to allow Johnny Daniels and Terry Tidwell to testify to the effect that either the defendant or Darrell Daniels stated such things as "got him off the road, or knocked him off the road or something about off the road," "shut his mouth or won't be talking," and "not going to be able to testify." The defendant claims such evidence violated Tenn.R.Evid. 403 in that it was confusing or misleading. The defendant does not contend, nor did he at trial, that the testimony was inadmissible as hearsay.

The trial court allowed the testimony before Darrell Daniels' case was severed. It noted that the testimony related to "a statement by one of these defendants as to what happened in a joint venture between two of them on the road." The record reflects that the statements were made by either the defendant or Darrell Daniels when they were side by side, having just returned from the second beating. The statements were relevant by tending to prove what happened regarding the second beating and the intent with which the second beating was administered. Whether or not the probative value of evidence is substantially outweighed by the danger of confusion of the issues, or misleading the jury is left to the sound discretion of the trial judge. *See, e.g., State v.*

---

**3.** The defendant contends that Dr. Harlan's testimony indicated the possibility that the fatal blow was struck in the first beating. Given the proven severity of the second beating, the defendant's comments about the second beating, the victim's appearance and conduct after the first beating, and the incomplete factual basis proffered by the defense upon which the doctor's acknowledgement was based (he was not advised of the second beating), the jury would be justified in concluding that the fatal blow was not delivered in the first beating.

*Banks,* 564 S.W.2d 947, 952 (Tenn.1978). Under the circumstances shown in this case, it was not an abuse of discretion for the trial court to conclude that the jury would not be unduly confused or misled in hearing this testimony.

In consideration of the foregoing, the convictions are affirmed.

WADE, J., and WILLIAM M. DENDER, Special Judge, concur.