# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 7, 2001

## STATE OF TENNESSEE v. ERIC TERRELL GLOVER

### Direct Appeal from the Circuit Court for Fayette County
### No. 4802   Jon Kerry Blackwood, Judge

---

### No. W2000-01278-CCA-R3-CD - Filed September 14, 2001

---

In July of 1999, a Fayette County Grand Jury indicted the Appellant, Eric Terrell Glover, for the following offenses: (1) first-degree premeditated murder; (2) first-degree felony murder; (3) especially aggravated kidnapping; and (4) especially aggravated robbery. Following a jury trial, Glover was convicted on all charges and, in accordance with the jury's verdict, was sentenced to life imprisonment for first-degree premeditated murder.[1] For his convictions of especially aggravated kidnapping and especially aggravated robbery, Glover was sentenced, as a violent offender, to concurrent twenty year sentences on each charge, with these sentences running concurrently to his life sentence. On appeal, Glover challenges the sufficiency of the evidence supporting his convictions as a principal offender under a theory of criminal responsibility for the conduct of another. He argues that the proof, at best, supports only the subordinate criminal responsibility of "facilitating." After review, we find no error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

DAVID G. HAYES, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Clifford K. McGowan, Jr., Waverly Tennessee, (on appeal only); Gary F. Antrican, District Public Defender; Shana McCoy-Johnson and Rickey W. Griggs, Assistant Public Defenders, Somerville, Tennessee, (at trial and on appeal).

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; John H. Bledsoe, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and Walt Freeland and Colin A. Campbell, Assistant District Attorneys General, for the Appellee, State of Tennessee.

---

[1]The trial court merged the felony murder conviction with the premeditated first-degree murder conviction.

# OPINION

## Factual Background

On June 15, 1999, Robert Lee and his wife of thirty-nine years, Barbara Ann Lee, were preparing for a trip they had planned to take the following day to visit their youngest daughter in Albuquerque, New Mexico. On that particular morning, Mrs. Lee, the victim, phoned her husband at work and asked how much cash she should withdraw for the trip. Mr. Lee suggested she only withdraw $200-300 because he did not want to carry a large amount of cash on his person. The victim agreed and proceeded to run many errands in preparation for the trip, including purchasing clothes at Eddie Bauer and withdrawing $200 in cash from the bank.

At approximately 1:00 p.m., the victim pulled into the Collierville Sonic in her newly purchased green 1997 Chevrolet Blazer and placed an order. Because the victim frequented that particular Sonic on a regular basis, Sharon Bryson, a car hop, recognized the victim and her dog, Otis. As Bryson exited the restaurant with the victim's food, she observed the following:

> Well, I noticed a black guy was in the back of her vehicle, and I knew that was unusual. And I leaned over to see what really was going on. So I noticed this other black guy standing down by her driver side of her vehicle. And I turned around and went in the inside to get someone to dial 911.

Bryson further testified that the person standing on the driver's side of the Blazer possessed a weapon.

Detectives Scott Young and Gamon Hill, of the Collierville Police Department, responded to the 911 call. As they interviewed Bryson, she stated that the man holding the gun was wearing a light blue wind suit and had been walking around the building earlier that same day. Bryson also informed officers that the men were previously seen that day in a blue car with a tan top. During the investigation, officers discovered a blue Buick LeSabre with a tan top parked at a NAPA auto parts store approximately 100 yards away. Officers noticed a Sonic cup inside the car. Further investigation revealed that the Buick was registered to and owned by Robert Lewis Carpenter, Jr., [hereafter "Carpenter"] with whom Detective Young was personally acquainted. Because the car was registered in Fayette County, officers immediately notified Fayette County law enforcement officers to be on the lookout for Carpenter or the victim's Blazer.

Criminal Investigator Chuck Pugh, of the Fayette County Sheriff's Department, was also familiar with Carpenter and lived only two miles from Carpenter's residence. On this particular day, Investigator Pugh was at his residence when he received a dispatch requesting that he drive by Carpenter's home on Yaeger Road in search of Carpenter or the Blazer. After he received this request, he proceeded to the Carpenter residence where he spoke with three of Carpenter's younger siblings. Investigator Pugh asked the siblings whether they had seen Carpenter that day and all

responded that they had not.[2]  As Investigator Pugh left the Carpenter residence, he was notified by dispatch that a citizen had reported that "they had just met a green Ford [sic] that appeared - that somebody was holding a gun on the lady in the car." After searching for the vehicle in a nearby community, Pugh returned to Yeager Road to again determine if the Blazer had returned to the Carpenter residence. As Investigator Pugh was driving by the residence, he met the Blazer coming out of the driveway. He recognized Carpenter as the person driving the Blazer and observed two other passengers in the vehicle. An immediate high-speed pursuit ensued. Detective Ricky Wilson, of the Fayette County Sheriff's Department, also joined in the high-speed chase which, at times, reached speeds in excess of 100 miles per hour.

When the road they were traveling dead-ended in a wheatfield in Northern Mississippi, the Appellant, Robert Carpenter [the Appellant's cousin], and Antonio Carpenter [the Appellant's cousin] all fled from the vehicle. Both the Appellant and Antonio Carpenter [hereinafter "Antonio"] were apprehended at the scene. The Appellant was found knee-deep in a pond wearing some of the Eddie Bauer clothing the victim had purchased earlier that same day. After being *Mirandized*, Investigator Pugh questioned the Appellant concerning the whereabouts of the victim. The Appellant stated that he "didn't have any idea about any white woman." The Appellant claimed that he had been at the Carpenter residence for the past two days and that the Carpenters had come by and picked him up in the Blazer. The Appellant further told Investigator Pugh that he had no idea why they all fled from the vehicle when it stopped. The Appellant remained calm, composed, and rational throughout the arrest and did not appear to be remorseful, sad or distraught. In fact, the Appellant falsely identified himself to officers, stating that his name was "Sincere Williams."

Investigators seized $306 in cash and two gold earrings from Antonio. Based upon information given to officers by Antonio, Investigator Pugh returned to the Appellant's residence and proceeded along a dead-end field road behind the house. Investigator Pugh described what he found in relevant part as follows:

> The first thing I saw when I pulled - I had parked when I - I saw a big snauzer [sic] dog. Snauzer [sic] that was laying in the road. It was alive. And I parked back up in this area here and walked down toward the dog, and the dog ran off in this area. I startled him. He was laying beside her body. But that's the first thing I saw. And I walked down to where he was, and that's when I discovered the body laying there in the ditch. She was clothed. She was laying in that indentation. She was covered up with horse blankets. They weren't as thick as horse blankets but something similar to that - covered up with a piece of log and some brush. It was laid on top of her.

---

[2]Through their investigation, officers later determined that Carpenter's siblings had lied about the whereabouts of their brother. In fact, the Appellant, Carpenter and Antonio had already driven down the field road behind the house at the time Investigator Pugh questioned the siblings. As Investigator Pugh testified, had he known their location at the time he questioned the siblings, "I would have went up there behind that field and hopefully prevented this."

Drag marks found at the scene indicated that the victim had been dragged 15 to 20 feet before being placed in the ditch. Investigator Pugh also found a number of personal items belonging to the victim including the victim's purse, credit cards, bank receipts, and identification. Approximately 50 feet from the body, officers found a sawed-off semi-automatic .22 rifle. Along the road and near the body, officers further located a number of Eddie Bauer clothes tags which had been torn from the clothing the victim had purchased earlier that day. Approximately four hours later, Carpenter was also apprehended and found wearing some of the Eddie Bauer clothing.

Detective Wilson questioned the Appellant on the night of his arrest. Because the Appellant was sixteen years of age, his father, Reverend James Wright, was present and consented to the interview. When asked about the circumstances and events that took place the afternoon of the victim's murder, the Appellant provided a statement which recited in pertinent part:

Q:	Earlier today (6-15-99) were you in Collierville, TN?
A:	Yes.

Q:	Who were you with?
A:	Antonio Carpenter and Robert Carpenter.
. . .

A:	We were supposed to help work on Antonio's car. Antonio wasn't ready to get up so we were going to go to Sonic where our friend "Mont" works because he gives us free food. I got 2 chili dogs, a fry and a slush.

Q:	Where did you eat your food?
A:	In behind Sonic. "Mont" sneaks the food out the backdoor. Robert was parked on the side next to NAPA auto parts sitting in his car waiting on me. When I finished eating, I went back to Robert's car. The green Blazer was parked on the passenger side of Robert's car. When I came around the Blazer I saw the ladies dog. I think the dogs name was Otis. I asked the lady did it bite and she said no. Robert got out of the car with the sawed off gun and went to her window. He told her to get to the other side. She tried to get out and he told her to get back here. She shut the door and [he] told her to shut up or he would shoot her. I got in the back of the Blazer and he told me to move his car to NAPA. I parked the car on the side next to Sycamore.

Q:	Describe the car to me?
A:	It's a Buick LeSabre. It's dark blue with a tan colored top.

Q:	What did you do after you parked the car?
A:	Went to the Blazer, gave Robert the key and went to get Antonio.

-4-

. . .

Q:     Where was the white lady at?
A:     Front passenger side.

Q:     What was she saying at this point?
A:     We could have her money, just let her go.

Q:     Did you or any of the other two take any money?
A:     Robert took the money and gave it to Antonio.

Q:     How much was it that he took?
A:     A little over $300.

Q:     When you left Antonio's, where did you go?
A:     Up to the train tracks and turned up through some factories. We went
       down to the road by the old milk barn and went into Fayette County.
       We went around by the big church by the highway and got on 57
       highway and went through Rossville. We turned on the road across
       from Troxel and went to Oak Grove and then to Yager [sic]. The lady
       was saying let me out, we were in the country. Robert wouldn't stop
       though.

. . .

Q:     Where did you and the rest go then?
A:     Up the hill behind the house about a mile or so. We sat in the car and
       Robert said he couldn't let her go because she had seen his face. She
       told him she wouldn't tell. He then told her he wouldn't hurt her and
       told her to get out of the car. When he said that she said, "you're going
       to kill me, aren't you?" She got out, I took her dog out. She asked me
       not to hurt him, I told her I wouldn't. Robert came around the back of
       the car while she was turned away and hit her in the back of the head
       with the gun. He hit her with the grip end of the gun. She went to the
       ground kind of backwards and blood started coming from her head.
       She was moving around some. We threw her purse out and left back
       down the hill towards Robert's house. The kids stopped us and told
       us the police had just left. Robert turned around and took off fast up
       the hill.

. . .

Q:     How did he get back out to the lady?
A:     Through the woods. I was in the back seat. Robert came back to the
       lady and ran over her. He then backed up and ran over a second time.

-5-

> We got out and me and Tony started getting upset with him for running over her. We picked her up and all three of us carried her over and put her in a low spot and covered her up with seat covers and lumber.

After the statement was reduced to writing, both the Appellant and his father were allowed to review the statement before the Appellant initialed each response as being correct.

Dr. O.C. Smith, medical examiner for Shelby County, performed an autopsy on the victim. At trial, Dr. Smith testified that the victim "died as a result of blows to the head, crushing neck injuries, a crushed chest, a crushed abdomen and a crushed pelvis." Dr. Smith testified that these injuries were massive and consistent with the victim being run over by a motor vehicle. Dr. Smith observed the presence of tire tracks on the left side of the victim's rib cage and further testified that the injuries sustained as a result of the motor vehicle were "slow injuries" indicating "that the car was not moving at a high speed." Dr. Smith could not determine how many times the victim was run over by the Blazer, and stated "it's possible that she was either moving under the vehicle, either being moved by the vehicle or moving herself . . . the injuries to the back side would indicate that we've got injuries going in this direction, but the injury pattern to the front of the chest indicates this direction." Nonetheless, Dr. Smith determined that the thirty-eight rib fractures, the crushed abdomen, and the crushed pelvis were the result of being run over by a motor vehicle.

Dr. Smith further testified that the victim had sustained blows to her face and deep bruises on the left arm which showed that "a fair amount of force was applied to the inside of the left arm for some purpose." Dr. Smith also testified that the victim received "crushing forces" to the front part of her neck which caused her voice box, trachea, and larynx to be crushed. Dr. Smith noted that the victim had also sustained "blunt trauma to the head." He opined, however, that the blow to the head was not sufficient in and of itself to cause death because the blow "did not produce any skull fracture, did not produce any brain damage." Dr. Smith could not specifically identify the weapon that was used to inflict the blows to the head, face, and neck but did conclude that the surface and edges of the injuries to the victim's body were consistent with the weapon being a rifle. Although Dr. Smith was unable to testify as to whether the victim was conscious or unconscious after the blow to the head, he was able to determine that she was alive when she received the blow to the back of her head, she was alive when she received the crushing force to the neck resulting in neck compression, she was alive when she received thirty-eight rib fractures, she was alive when her pelvis was crushed, and she was alive when her abdomen was crushed. He further testified "that the injuries were contemporaneous, which means they probably all [had] to be administered or sustained within about [an] hour's time."

## Sufficiency of the Evidence

The Appellant asserts that the evidence at trial was insufficient to support his convictions under a theory of criminal responsibility for the acts and offenses of others. Specifically, he contends that facilitation is a more appropriate theory of culpability and argues that the trial court erred by failing to grant his motion for judgment of acquittal or by failing to act as the thirteenth juror to "modify the verdict to reflect that [the Appellant] was guilty of facilitation on each of the counts."

A motion for judgment of acquittal raises a question of law for the trial court's determination. State v. Hall, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983). When the trial court is presented with a motion for judgment of acquittal, the only concern is the legal sufficiency, as opposed to the weight, of the evidence. State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996). Appellate courts are ill-suited to assess whether the verdict is supported by the weight and credibility of the evidence. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995). For that reason, in Tennessee, the accuracy of a trial court's thirteenth juror determination is not a subject of appellate review. Id.; State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App.1993). Instead, once the trial court approves the verdict as the thirteenth juror, appellate review is limited to determining the sufficiency of the evidence. Burlison, 868 S.W.2d at 719.

Accordingly, the standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction; that is, whether the evidence presented at trial was so deficient that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), *cert. denied*, 513 U.S. 1086, 115 S. Ct. 743 (1995); Tenn. R. App. P. 13(e). A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this Court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *See generally* State v. Adkins, 786 S.W.2d 642, 646 (Tenn. 1990); State v. Burlison, 868 S.W.2d 713, 718-19 (Tenn. Crim. App. 1993). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), *cert denied,* 507 U.S. 954, 113 S. Ct. 1368 (1993).

In the present case, the jury was instructed as to both criminal responsibility by the conduct of another and criminal responsibility for facilitating the crimes. After hearing the evidence, the jury convicted the Appellant for the following offenses under a theory of criminal responsibility for the conduct of another: (1) first-degree murder (premeditated); (2) first-degree murder (felony); (3) especially aggravated kidnapping; and (3) especially aggravated robbery. A person is criminally responsible for the conduct committed by the conduct of another if:

Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense.

Tenn. Code Ann. § 39-11-402(2). Facilitation, however, involves the following:

A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under Tenn. Code Ann. § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the offense.

Tenn. Code Ann. § 39-11-403(a). Facilitation of a felony is a lesser degree of criminal responsibility than that of criminal responsibility for the conduct of another. State v. Burns, 6 S.W.3d 453, 470 (Tenn. 1999). The Sentencing Commission Comments expressly characterize facilitation as "a lesser included offense [of criminal responsibility] if the defendant's degree of complicity is insufficient to warrant conviction as a party." Tenn. Code Ann. § 39-11-403, Sentencing Commission Comments. The facilitation statute is premised upon a theory of vicarious responsibility because it applies to a person who facilitates criminal conduct of another by knowingly furnishing substantial assistance to the perpetrator of a felony, but who lacks the intent to promote or assist in, or benefit from, the felony's commission. *See* Tenn. Code Ann. § 39-11-404, Sentencing Commission Comments.

The Appellant contends that he played a "passive role" in the crimes and, as such, he should have been found guilty of "facilitation on each of the counts." We disagree.

The proof at trial established that the Appellant was present throughout the entire criminal episode and assisted in the commission of the crimes and benefitted in the proceeds. It was the Appellant who first approached the victim at the Sonic and who got into the back seat of her Blazer while Carpenter held a gun to the victim. It was the Appellant who moved Carpenter's vehicle to the NAPA lot to remove it from view. It was the Appellant who removed the victim's dog from the Blazer and assisted in throwing the victim's purse from the vehicle. Again, the Appellant assisted in attempting to conceal the victim's body, along with his accomplices by dragging the victim to a ditch where they covered her with seat covers and lumber. When apprehended, the Appellant was wearing Eddie Bauer jeans and an Eddie Bauer shirt which had been purchased by the victim. After the high-speed pursuit by law enforcement, the victim ran until officers captured him in a pond. When questioned, the Appellant falsely identified himself as "Sincere Williams" and denied knowing anything about the victim. In fact, it was Antonio, and not the Appellant, who led police to the location of the victim's body. Only hours later did the Appellant admit to his involvement in the crime. We conclude that the facts of this case and the evidence introduced at trial clearly establish that the Appellant acted with the intent to assist in the commission of the offenses, by aiding and benefitting in the proceeds. As such, we find the proof sufficient to support the Appellant's convictions.

## CONCLUSION

We find that the evidence presented at trial was more than sufficient to support the Appellant's convictions under a theory of criminal responsibility pursuant to Tenn. Code Ann. § 39-11-402(2). Accordingly, the judgments of conviction for first-degree murder, especially aggravated kidnapping and especially aggravated robbery are affirmed.

_____
DAVID G. HAYES, JUDGE