IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 25, 2012 Session

**STATE OF TENNESSEE v. JUSTIN ELLIS**

**Appeal from the Criminal Court for Knox County**
**No. 93768     Bob R. McGee, Judge**

**No. E2011-02017-CCA-R3-CD - Filed March 22, 2013**

The Defendant, Justin Ellis, was convicted by a Knox County jury of aggravated burglary, employing a firearm during the commission of a dangerous felony, aggravated assault, and aggravated robbery. The aggravated assault conviction was merged with the aggravated robbery conviction. The trial court imposed an effective nineteen-year sentence. On appeal, the Defendant argues that the successor judge erroneously determined that he was qualified to act as thirteenth juror in this case. Following our review of the record and the applicable authorities, we conclude that the successor trial judge could not act as the thirteenth juror and reverse the judgments of the trial court and remand the case for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed;**
**Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE, J., joined. ROBERT W. WEDEMEYER, J., filed a dissenting opinion.

Joshua D. Hedrick, Knoxville, Tennessee, for the appellant, Justin Ellis.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the December 29, 2009 armed home invasion of the victims, Isiah Cobb and Jessica Greene. On February 9, 2010, a Knox County grand jury returned a nine-count indictment against the Defendant, charging him with two counts of aggravated burglary, one count of employing a firearm during the commission of a dangerous felony,

two counts of especially aggravated kidnapping, and four counts of aggravated robbery. See Tenn. Code Ann. §§ 39-13-305, -13-402, -14-403, -17-1324. Prior to trial, the State dismissed one count of aggravated burglary and two counts of aggravated robbery. Trial proceeded on the remaining six charges.

Twenty-one-year-old Isiah Cobb testified that he was working at Little Caesars in December 2009 and living on Chickamauga Ave in Knoxville. He lived there with his girlfriend Jessica Greene and a roommate, Justin Woodruff. Mr. Cobb testified that he knew the Defendant prior to the home invasion, that Mr. Woodruff and the Defendant were friends, and that he later learned that Mr. Woodruff and the Defendant were related.

Mr. Cobb stated that he had previously tried to help the Defendant get a job. Mr. Cobb testified that, about a week before the home invasion, the Defendant, along with Mr. Woodruff, came by Mr. Cobb's workplace, and the Defendant obtained an application for employment. Mr. Cobb told the Defendant to fill out the application, and Mr. Cobb would talk to his managers and "see what [he could] do about getting [the Defendant] a job[.]"

Mr. Cobb provided a list of the items that he had received or bought as Christmas presents that year: an "in-dash TV, iPod touch, Nintendo DS, little electronics"; a purse and bracelet he had purchased for Ms. Greene; and clothes he had bought for his one-year-old son. He stated that he drove a 1998 Grand Marquis, which had recently been involved in a wreck and an insurance claim was pending at the time of the home invasion.

Mr. Cobb then provided that the following events occurred on December 29, 2009. Just after midnight, he returned home from work. He recalled that the "bottom door handle" on the back door was locked but that he "didn't make sure the dead bolt was locked." Mr. Cobb and Ms. Greene had brought some food home. He went to his bedroom in the back of the house, and while he was on the phone, "[a]ll of a sudden [he] heard a loud commotion bust through the back door[.]" Ms. Greene ran inside the bedroom, followed by an armed gunman, who he identified as the Defendant. The gunman ordered Mr. Cobb "to put the phone down and drop everything" and proceeded to "tell [them] to give all of [their] belongings" to him. The couple started putting their things inside a bag. According to Mr. Cobb, the gunman was wearing gloves and had on a "black hoodie[,]" so Mr. Cobb believed "he was there to kill [them]." Mr. Cobb described the gun as a black 9mm "with chrome on it[.]"

Mr. Cobb testified that the gunman pointed the weapon at his chest and face, ordering him not to move or he would kill him. According to Mr. Cobb, the gunman proceeded to confront Ms. Greene with the weapon, pointing it at her chest and asking, "What you got in your bra? Where is the money at?" He then instructed the couple to take off their clothes.

Mr. Cobb stated that he did not move "at all" because he "was scared [he] was going to get shot." His back was against the wall, and he was "crouched" down, "basically begging" for "[his] life." The gunman continued packing items into the bag.

According to Mr. Cobb, the gunman obtained items from "the room, closets, jewelry box on top of [the] TV stand, [and] change inside a Mason jar." Mr. Cobb stated that "[t]here were several items spread all across the room" because it was "the holiday season" and he had been "messing with [his] gadgets[.]" Mr. Cobb also testified that the gunman took his "bill money[,]" which was approximately $1,100 in cash for the rent, utilities, and phones. Mr. Cobb noticed that some of his son's clothes were missing, along with several toys.

After the gunman gathered everything, he ordered the couple to give him their car keys. He then took Ms. Greene's purse and started "stuffing stuff in it." He ordered them not to move and then left the bedroom for few seconds. He returned and said, "Don't move. I told you stay where you are. Do not move at all[.]" Mr. Cobb continued to "toss[] him everything" in an effort to get the gunman to leave. Mr. Cobb believed that the gunman tried to start their other vehicle but that it did not start because there was "something wrong with the ignition and starter[.]" Mr. Cobb opined that this required the gunman to move the stolen items to the Grand Marquis. The gunman again returned to the bedroom and ordered them not to move, "[s]till just taking nicknack things." The gunman went outside again for a second time and tried "to start a car up."

He returned again to the bedroom and began arguing with the couple: "Telling us, 'Where's the rest of the money? I know you hiding something in here. If you don't give it up, I'm going to kill you.'" He was still pointing the weapon at their faces and ordering them to "stay on the ground." The gunman pretended like he was going to leave but again returned, acting "like he's going to shoot." Mr. Cobb described this behavior as "playing games." Mr. Cobb assured the gunman that he "got everything" and begged him to leave.

The gunman finally left, and still afraid, they waited in the bedroom. Thereafter, Ms. Greene's brother, Arnold Greene, arrived. Mr. Greene came to the house because he was the person on the phone with Mr. Cobb at the time the gunman entered the house and he heard the commotion. They then used Mr. Greene's phone to call 911.

Mr. Cobb testified that he did not give the Defendant permission to enter his house on December 29, 2009. According to Mr. Cobb, Mr. Woodruff had moved out of the house "the same day" as the home invasion. Before Mr. Cobb left for work, no one was at his house; Ms. Greene had also left to go to work.

Mr. Cobb's car was returned to him in May 2010. The car had been titled in someone else's name. None of the other stolen items were ever recovered.

On cross-examination, Mr. Cobb confirmed that he originally reported "the total value of all this stuff was about $9,000[.]" He stated that he either bought all of the items with his salary or that they were Christmas gifts.

Mr. Cobb also confirmed that he and Ms. Greene refused to take off their clothing, although instructed by the gunman to do so. Mr. Cobb did remove his "chain" and wallet from his person and gave them to the gunman. Mr. Cobb agreed that the gunman "didn't gag [him] with anything, tape over [his] mouth or any of that[.]" Mr. Cobb was forced to stay in the bedroom due to the gunman's display of force. According to Mr. Cobb, he was "headed towards the door, and [he] was forced back inside the room by a man holding a gun, with gloves on his hands." Mr. Cobb agreed that the gunman never fired his weapon.

Mr. Cobb stated that the Defendant "had never been at [his] house before." If the Defendant had come to the house with Mr. Woodruff while Mr. Cobb was out, Mr. Cobb believed Mr. Woodruff would have informed him of the visit.

Ms. Greene testified that she was nineteen years old and that Mr. Cobb was her boyfriend. She worked as an assistant manager at Little Caesars; she worked at a different location from Mr. Cobb.

Ms. Greene testified to several items she received for Christmas that year: "[c]lothes, jewelry[,] . . . a iPod DS and an iPod touch, an Nintendo DS." She received a Juicy Couture purse from Mr. Cobb, and she also had a Coach purse and a Coach wallet. She also testified that they had two cell phones, one for each of them, and that they owned two vehicles, a 1995 Cadillac Deville and a Grand Marquis. Both vehicles were parked in the driveway on the evening of the home invasion. She was asked if she knew the Defendant prior to the home invasion, to which she responded: "Far as knowing him, no. I knew his face. I had seen him before, probably two or three times, maybe, not in a row. I had seen him in the past."

Ms. Greene gave a similar recount of the events as Mr. Cobb. According to Ms. Greene, they had just gotten home after getting some food at Wendy's. They shut the door and went to the bedroom to eat when she heard a "big commotion." The gunman entered the bedroom, pointed the weapon at her, and said, "Get on the ground. I need everything. I need money, purses, everything y'all have." She complied and got down on her knees. She began throwing items of value towards him, and he was "shoving everything down" in her Coach backpack; this backpack was different from the Coach purse she previously described. The gunman approached her and "started tugging on [her] shirt, telling [her] to take [her] shirt

off[.]" Ms. Greene refused. The gunman took her purse, her phone, both sets of car keys, the "change jar and stuff like that[.]" The gunman then ordered them not to move or he would shoot. The gunman kept leaving the house and returning to the room several times, "[l]ike it was a joke or something, just making [them lie] on the ground, making [them] stay down." The gunman left the house in their Grand Marquis. She described the gun used as "black and chrome" and said "[i]t looked like a 9-millimiter [sic]." She did not give the Defendant permission to enter her house that evening.

When her brother arrived "[a] couple of minutes" later, she borrowed his phone and called 911. She said that she was "real scared" when talking on the phone with the 911 operator but that she tried to remain calm and relay the information to the operator. The 911 call was played for the jury. She acknowledged that, during the call, she asked Mr. Cobb a lot of questions about the gunman, stating that this was because she "didn't know anything about him." Ms. Greene admitted that she initially replied that the gloves worn by the gunman were yellow but that Mr. Cobb corrected her that they were red. Ms. Greene also testified that, initially, she "was unsure" of how the gunman entered the house. She was not sure if Mr. Cobb had left the door unlocked or if the gunman had kicked it in, but she later realized that the door had been kicked in "because the bottom lock was broke[.]" She showed the door to the responding officer.

On cross-examination, Ms. Greene acknowledged that in the 911 call, she told the responding officer that they had spoken with Samantha Ellis, the Defendant's cousin, following the home invasion and that Ms. Ellis said the Defendant was "probably going to" Green Hills Apartments. Ms. Greene then clarified that Mr. Cobb had spoken with Mr. Woodruff, who had spoken to Samantha Ellis. This conversation between Mr. Cobb and Mr. Woodruff occurred prior to the call to 911.

She also admitted that she told the 911 operator that the gunman did not force his way inside, but Mr. Cobb again corrected her. Ms. Greene stated that she had not seen the door at the time she was speaking with the operator. She also asked Mr. Cobb to provide a description of the gunman's clothing, which she relayed.

Ms. Greene confirmed that she refused to remove her clothing and that she did not pick up the change off the floor as instructed.

Officer John David Lawson of the Knoxville Police Department was the responding officer on the scene. After receiving the call, he went to the victims' home, where he met them in the front yard. He "had to calm them down and speak with them." They said that they had been robbed. Officer Lawson took down the information they reported.

Officer Lawson went inside the house to investigate. "It seemed in disarray. The bedroom was kind of tossed around, the belongings in the bedroom, and just little things seemed out of place." He recorded the items they reported as stolen. He then went to look at the door, where the gunman had allegedly entered. According to Officer Lawson, the door "was damaged and didn't have a very good lock on it[.]" His observations of the door were consistent with the version of the events given by the victims. After speaking with the victims, officers attempted to located the Defendant that evening, but they were unsuccessful.

Officer Lawson confirmed that his vehicle was equipped with an audio and video recording device. He wore a device that recorded his interactions on his vehicle's equipment. His conversation with the victims was recorded on this equipment.

On cross-examination, Officer Lawson agreed that the victims had stated the gunman took approximately $650 in cash. He was again asked about the condition of the door. Officer Lawson stated that "the strike plate . . . looked old and worn, and it looked like it had been knocked around a little bit, and it was cracked." He further described that it was "cracked" around "the strike plate[.]" The frame was "[c]racked and splintered a little bit[,]" but it "wasn't knocked out or knocked on the ground[.]" Officer Lawson agreed that the door had "seen a lot of hard days[.]"

On redirect, the officer elaborated as to more of the items reported missing: "$650 cash with miscellaneous bills, two cell phones, jewelry, more jewelry, keys to the . . . Mercury. Some coins and miscellaneous assorted in a coin jar, kid's clothing and shoes." It was also reported that the gunman took a wallet and a purse. The recording of Officer Lawson's conversation with the victims was then played for the jury.

Over the recording, the victims can be heard telling Officer Lawson the details of the home invasion, providing much of the same details as given in their trial testimony. However, Mr. Cobb can be heard saying that the Defendant had previously visited their house.

Following the presentation of proof, the jury found the Defendant guilty of one count of each of the following—aggravated burglary, employing a firearm during the commission of a dangerous felony, and aggravated robbery. The jury also found the Defendant guilty of aggravated assault as a lesser-included offense of aggravated robbery, but acquitted the Defendant of the especially aggravated kidnapping charges. Judge Richard Baumgartner was the presiding judge over the Defendant's trial. After the verdict, Judge Baumgartner simply stated, "real mixed verdict[,] . . . [v]ery interesting."

Thereafter, the original trial judge, Judge Baumgartner, pled guilty to one count of official misconduct and resigned from the bench. At that time, he had not expressly approved the verdict as thirteenth juror in this case.

Senior Judge Jon Kerry Blackwood conducted the Defendant's sentencing hearing on February 18, 2011. The trial court merged the aggravated assault and aggravated robbery convictions. After hearing the evidence, the judge sentenced the Defendant as follows: five years for the aggravated burglary conviction; nine years for the employing a firearm during the commission of a dangerous felony conviction; and ten years for the aggravated robbery conviction.[1] The five-year sentence was ordered to run concurrently with the ten-year sentence but consecutively to the nine-year sentence, for a total sentence of nineteen years in the Department of Correction.

On March 17, 2011, the Defendant filed his motion for new trial and a renewed motion for judgment of acquittal. He later amended his motion, rasing the issue, among others, of whether the successor judge could properly act as thirteenth juror in this case. Judge Bob McGee was designated to hear the Defendant's motion for new trial. Therefore, Judge McGee, as the successor judge, was required to consider whether he could perform the thirteenth-juror review.

After a hearing, Judge McGee denied the motion for new trial and motion for judgment of acquittal, approving the verdict. Judge McGee reasoned as follows:

> [I]t does appear that the [State v.] Biggs[, 218 S.W.3d 643 (Tenn. Crim. App. 2006),] case is limited to where, not just where [credibility] is overriding. I think that's the word they use, but it's actually a situation where [credibility] is the whole case.
>
> It is limited pretty much to situations that we sometimes call he said, she said, where the only evidence of the crime is the testimony, the victim, and the only evidence rebutting that -- is the testimony of the defendant. And we are post-trial now, the defendant's right to testify or not to testify was protected at the trial and he made his decision. In judging retrospectively,

---

[1] We note that the original judgment form for the Defendant's employing a firearm during the commission of a dangerous felony conviction, a Class C felony, reflects that he was a sentenced as a Range I, standard offender. However, the Defendant received a nine-year sentence for this conviction, which is outside of the standard offender range for a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(3) (A Range I sentence for a Class C felony is not less than three nor more than six years). The judgment form for the employing a firearm conviction was later "corrected to a multiple offender status and a multiple 35% release eligibility." However, nothing in the record supports the decision to enhance the Defendant to Range II.

what the quality of the verdict was. Certainly we are -- we have to take into consideration what the testimony was and the fact is in this case there was no testimony contradicting the testimony of the victims. None.

We don't have witness versus witness here. We have witness versus argument and that's not what the Biggs case is about. Also, I did read the transcript. The tenor of the testimony of the victim's was not that they refused to take their clothes off because they were standing up to the guy. They both testified they were scared to death that if they moved at all he would shoot them. The jury apparently accepted that testimony.

Also, there was never any real dispute that the defendant was present in the premises and that he stole things from them. So, it's not even by -- you can't even say that the idea was floated to the jury that none of this ever happened. That wasn't in any way presented to the jury. And there was evidence to support the proposition that there was a breaking and entering, damage to the back door. Particularly the witness, I think Jessica Greene, Ms. Greene at least testified that the bottom lock, she called it, was broken. So, this is not a situation where the case hangs entirely on [credibility]. The [credibility] of the victims was not rebutted. There was nothing for the jury to weigh in opposition to the [credibility] of the witnesses. They found the witnesses to be credible and they also apparently gave considerable attention to the case and reflected upon it because they found him not guilty of the kidnapping charges. And it would appear to this [c]ourt that the jury did what they were supposed to. They did a good job and this [c]ourt does accept their vedict.

This timely appeal followed.

## ANALYSIS

On appeal, the Defendant argues that the trial court erred in denying his motion for new trial "where the credibility of the witnesses was the sole issue at trial and the trial judge did not fulfill his obligation as thirteenth juror prior to being replaced by a successor judge." Specifically, the Defendant submits that

[i]t is error for a judge, sitting as thirteenth juror, to assume that there is no issue of witness credibility merely because there was not evidence presented by the defense. . . . [T]he jury and the judge as thirteenth juror are still tasked with the role of determining whether they believe the testimony of

-8-

the State's witnesses and whether the State's proof is sufficient to convict, both in terms of quantity and reliability.

The State responds that the successor judge did not err or abuse his discretion in determining that he could act as thirteenth juror because witness credibility was not the overriding issue in this case. The State explains that the successor judge correctly determined that credibility was not an overriding issue because the witnesses' testimony was not rebutted, and defense counsel stated the theory of defense was that the Defendant was there by invitation and simply stole some things while the victims were not looking.

Rule 33(d) of the Rules of Criminal Procedure provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule "is the modern equivalent to the 'thirteenth juror rule,' whereby the trial court must weigh the evidence and grant a new trial if the evidence preponderates against the weight of the verdict." State v. Blanton, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996)). In State v. Carter, the supreme court interpreted this rule as "impos[ing] upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[.]" 896 S.W.2d 119, 122 (Tenn. 1995). The supreme court also held that "approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." Id.

In situations when a trial judge is unable to perform post-verdict duties, Rule 25(b)(1) of the Rules of Criminal Procedure provides: "After a verdict of guilty, any judge regularly presiding in or who is assigned to a court may complete the court's duties if the judge before whom the trial began cannot proceed because of absence, death sickness, or other disability." Rule 25(b)(2) elaborates that "[t]he successor judge may grant a new trial when that judge concludes that he or she cannot perform those duties because of the failure to preside at the trial or for any other reason." This court has held that a successor judge's consideration, pursuant to Rule 25(b) of whether the duties of the original judge with regard to a motion for new trial can be met in a particular case "must include an assessment of his or her ability to act as a thirteenth juror, including witness credibility." State v. Nail, 963 S.W.2d 761, 765 (Tenn. Crim. App. 1997); see also State v. Biggs, 218 S.W.3d 643, 653-54 (Tenn. Crim. App. 2006); State v. Brown, 53 S.W.3d 264, 275 (Tenn. Crim. App. 2000). This assessment in turn requires the successor judge to determine "the extent to which witness credibility was a factor in the case and the extent to which he [or she] had sufficient knowledge or records before him [or her] in order to decide whether the credible evidence, as viewed by the judge, adequately supported the verdict." Nail, 963 S.W.2d at 766; see also Biggs, 218 S.W.3d at 654; Brown, 53 S.W.3d at 275. If these determinations cannot be made by the successor judge, then the verdict cannot be approved and a new trial must be granted. See Biggs, 218 S.W.3d at 654; Brown, 53 S.W.3d at 275; Nail, 963 S.W.2d at 766.

The Defendant relies on State v. Biggs, wherein this court ruled that the successor judge was required to grant a new trial because the presiding judge did not rule as the thirteenth juror and unresolved credibility issues remained. 218 S.W.3d at 654. Just as in Biggs, the statements by the presiding judge in this case, "real mixed verdict[,] . . . [v]ery interesting[,]" were ambiguous as to whether he approved the jury's verdict. See id. Therefore, we must address whether the successor judge erroneously concluded that he could sufficiently familiarize himself with the written record in order to act as the thirteenth juror and approve the jury's verdict. See id. at 654-55.

"Given the statement made by our supreme court regarding the purpose of the thirteenth juror rule, it is difficult to see how a trial judge who has not heard the evidence and who has not seen the witnesses can act as the thirteenth juror when weight and credibility are issues." Brown, 53 S.W.3d at 275. "When a trial judge is asked to review the weight and credibility of the evidence as the thirteenth juror based upon a written record, the trial judge 'is in no better position to evaluate the weight of the evidence than an appellate court.'" Id. (quoting State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995)). The appellate courts have no independent authority to act as thirteenth juror. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

In Biggs, the jury convicted the defendant of aggravated sexual battery. 218 S.W.3d at 652. The Biggs court found that the successor judge was required to grant a new trial because the presiding judge did not rule as the thirteenth juror, as there were unresolved credibility issues, reasoning as follows:

> This case involved accusations by the victim and her parents and a denial of any wrongdoing by the defendant, with no physical evidence present. Witness credibility was an overriding issue in this case. The jury chose to accredit the testimony of the victim and her parents. However, the successor judge was not at the trial to see any of the witnesses testify and would have been unable to make a credibility determination from the written record. A successor judge cannot rule on a motion for a new trial if witness credibility is an overriding issue.

Id. at 655.

The present case is indistinguishable from Biggs. The fact that the Defendant did not put on any proof to rebut the testimony of the State's witnesses does not, by itself, mean that credibility was not an overriding issue. The validity of the Defendant's convictions depends upon the jury's and ultimately the judge's, acting as thirteenth juror, determinations of the credibility and weight of the victims' testimony. Even if the Defendant conceded his

presence at the scene, there were still credibility determinations to be made regarding the elements of the offenses, i.e., whether he entered the house forcefully and wielded a gun while stealing the victims' possessions. See Tenn. Code Ann. §§ 39-13-102 (under the facts of this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and . . . [u]ses or displays a deadly weapon"); 39-13-402 (aggravated robbery, as relevant here, is "robbery as defined in § 39-13-401 [and a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon"); 39-14-403(as charged here, aggravated burglary is entry of a habitation without the effective consent of the property owner and with the intent to commit a theft); 39-17-1324 (possession of a firearm offense). The victims testified that the Defendant kicked in their back door, entered their home, held them at gunpoint, and stole their things, including their car. Only the car was later recovered, and no evidence presented during the trial connected the Defendant to the car other than the victims' testimony.[2] No gun was ever found. Officer Lawson testified that the strike plate on the door was "old and worn" and "looked like it had been knocked around a little bit, and it was cracked." He agreed on cross-examination that the door had "seen a lot of hard days[.]" Other than the victims' own statements, no one provided any independent knowledge of what was taken from the victims, that it was taken at gunpoint, or that the Defendant entered the residence forcibly. The recordings of the 911 call and from Officer Lawson's vehicle serve simply to bolster the victims' credibility; they do not provide independent evidence that the statements made in the recordings or that the victims' trial testimony are true. Upon review, we conclude that witness credibility was an overriding issue and that a new trial is therefore required.

---

[2] We note that opening and closing statements were not transcribed and included in the record on appeal. Outside the presence of the jury, defense counsel summarized the theory of defense as follows:

> [I]t will be our position today that [the Defendant] was there by invitation, having spent several days there at the invitation of the roommate, his cousin, and that he did take some items from them, but that he did not do so by force. He waited until they were basically not paying attention, grabbed their marijuana and their car keys and took off in their car.

The trial court asked, "And you claim there was no weapon, and that he just stole certain items while they weren't looking--watching." Defense counsel replied, "That's what my client tells me, your Honor, yes sir." However, the statements of counsel are not evidence. At trial, neither victim testified that the Defendant was at their house that evening by invitation. Additionally, Mr. Cobb testified that the Defendant had never been inside the residence. Defense counsel's statement that the Defendant was there by invitation and subsequently stole the car was not evidence and was not supported by the evidence adduced at trial.

-11-

## CONCLUSION

Based upon the foregoing reasoning and authorities, we conclude that the successor judge could not properly act as thirteenth juror in this case because credibility was an overriding issue. The judgments of the trial court are reversed, and this case is remanded for a new trial.

_____
D. KELLY THOMAS, JR., JUDGE