IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 8, 2025

**STATE OF TENNESSEE v. DIAMOND LEAH WILSON**

**Appeal from the Circuit Court for Maury County**
**No. 2022-CR-30012        David L. Allen, Judge**

_____

**No. M2023-01801-CCA-R3-CD**

_____

The Defendant, Diamond Leah Wilson, was convicted by a Maury County Circuit Court jury of aggravated neglect of a child who was age eight or less, a Class A felony, for which the Defendant is serving a sixteen-year sentence at 100% service. *See* T.C.A. § 39-15-402 (Supp. 2024). On appeal, she contends that (1) the trial court erred in approving the verdict in its role as thirteenth juror, (2) the evidence is insufficient to support her conviction, and (3) the trial court erred in sentencing. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

William C. Barnes, Jr., Columbia, Tennessee, for the appellant, Diamond Leah Wilson.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Ross Boudreaux, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant's conviction results from her thirteen-month-old son's ingestion of fentanyl. After Jessica Anderson, the Defendant's mother, called 9-1-1, the victim was revived with Narcan. The victim continued to experience symptoms and received further medical care for weeks afterward.

At the trial, Maury County 9-1-1 Assistant Director James Lynn Thompson identified a recording of a 9-1-1 call received on July 1, 2022, at 2:46 p.m. The call was played for the jury. In it, Ms. Anderson stated that her one-year-old grandson "got ahold of something," was "breathing funny," and was "dozing off like he's trying to go to sleep

or something." She later said her grandson was shaking and breathing but was not awake. She said that her former roommate had used drugs but that she had cleaned the home well after the roommate moved.

Columbia Police Department (CPD) Officer Jesse Hughes testified that he responded to a call on July 1, 2022, involving an infant who "was going into apparent unconsciousness." He arrived after medical responders, who were attending the victim. He spoke with Ms. Anderson and her daughter, the Defendant.

Officer Hughes testified that the Defendant told him that she thought the victim "had ingested something he found on the floor." She reported that the victim had behaved normally throughout the day but started to lose consciousness after she bathed him. She reported that she tried to revive the victim by using saline nasal spray and by splashing him with water. She stated that when these efforts failed, she asked Ms. Anderson to call 9-1-1. The Defendant stated that she "was not sure what the child had taken" and that the child had been on the floor, where an air vent "had been pulled up[.]" The Defendant also stated that, a couple of months earlier, she had moved into a bedroom that had previously been occupied by Ms. Anderson's former roommate and that "they" found "baggies used to purchase narcotics and tin foil . . . strewn about the room" when cleaning it after the former roommate's departure.

Officer Hughes testified that, with permission, he searched the Defendant's bedroom and the bathroom in which the Defendant had bathed the victim. He agreed that he did not find anything of apparent evidentiary value. He said he made a referral to the Department of Children's Services (DCS) and obtained consent from Ms. Anderson and the Defendant to collect their urine samples.

A July 1, 2022 recording from Officer Hughes's body camera was played. Audio was redacted from portions of the recording, and only portions of the recording were shown to the jury. The recording showed emergency medical personnel attending the victim and the Defendant and Ms. Anderson showing a bedroom to and speaking with Officer Hughes. An unidentified paramedic entered the bedroom and spoke with the Defendant, who stated that the victim had been tired but would not lie down. She stated that the victim played on the floor as she used her cell phone to view TikTok. The Defendant stated that she had not seen any substance on the floor but that, "He put whatever it was in his mouth." Officer Hughes asked the Defendant what she thought the victim had ingested, and she said she did not know. When Officer Hughes asked what had been in the bedroom, the Defendant's response was partially unintelligible, but included, "[E]verything." The Defendant agreed that the victim's symptoms had begun about twenty minutes earlier. The recording showed Officer Hughes and Ms. Anderson searching the bedroom, particularly the floor, and Officer Hughes searching a bathroom after speaking with Ms. Anderson.

Officer Hughes testified that he "didn't see anything of note" when he searched the bedroom floor. He said that he returned to the home the next day, after Ms. Anderson called the police to report that she had found aluminum foil with burn marks and "possible residue" in the Defendant's bedroom. He agreed that his investigation showed that the Defendant and the victim shared the bedroom. Officer Hughes said that, when he went to the home on July 2, 2022, he collected the aluminum foil Ms. Anderson had found. He said the aluminum foil had burn marks. He said that another officer assumed responsibility for the investigation after his July 2 visit to Ms. Anderson's house and that he did not know if the aluminum foil was tested by the Tennessee Bureau of Investigation (TBI) laboratory.

The body camera recording from Officer Hughes's July 2, 2022 visit to Ms. Anderson's home was played for the jury. The sound was redacted, other than a brief conversation he had with the Defendant, in which she denied heroin use and said that if her blood sample were obtained and analyzed, it would not contain evidence of any drugs except marijuana. The recording also showed Officer Hughes taking possession of the aluminum foil, which contained black marks.

Dixie Mainord testified that she and the Defendant had been friends since elementary school and that she had taken custody of the victim a few days after July 1, 2022, at the Defendant's request. At the time of the trial, Ms. Mainord had legal custody of the victim. She said that, about two weeks after the July 1 incident involving the victim, she learned of the incident from a family friend. She did not speak with the Defendant, who was "in rehab at the time," but they exchanged text messages on July 14, 2022. She said that, at the time, she was concerned about the victim's behaviors. She said he was "off balance," "uncontrollably using the bathroom," and "twitching in his sleep." She said that these behaviors were not usual for the victim and that she and the Defendant discussed them in the text messages. She identified a document containing the text messages, which was received as an exhibit. The messages contained the following statement, which Ms. Mainord said was from the Defendant:

It was really scary, especially since I had no clue where or what he got, I just know when his test work came back at the hospital. That was my s--- & ever since I've been over that crap. I definitely didn't leave nothing for him to get, I never misplace anything. I believe when I split a piece, a piece flew on the ground & he sticks everything in his mouth!!

In the text messages, the Defendant also expressed her desire to parent her children and stated that she had begun using drugs when she had not been prescribed pain medication for her back pain after childbirth. She stated that she had been physically sick from drug withdrawal and did not want to use drugs. She also stated that "he" might experience

withdrawal, although "they doubt it," and that she would schedule a pediatrician appointment for "him" for the next morning. The Defendant stated in the text messages that the drugs would only stay in a person's "system" for twenty-four to forty-eight hours. She also stated that she had been with "him" for three days and had not seen any symptoms of drug withdrawal.

Ms. Mainord testified that, a couple of weeks after the July 1, 2022 incident, she took the victim to Vanderbilt University Medical Center because he still had symptoms. She said the victim had diarrhea, twitched in his sleep, and was off balance for about a week and a half after she took him to Vanderbilt. She said the medical providers at Vanderbilt gave him Tylenol and "ran tests" but never gave her the victim's diagnosis. She said the victim was thirteen months old in July 2022.

The victim's July 1, 2022 medical records from Maury Regional Medical Center were received as an exhibit. They contain the following statement in the "EMS" portion of the records:

> The patients mother states that she saw the patient ingest a white substance he found on the floor and the patient became heavily drowsy but the mother is unsure of the substance. The mother states that a roommate recently moved out of that room where the patient found the substance and that the roommate had been a drug addict.

A form authorizing transfer to Vanderbilt University Medical Center stated that the victim's diagnosis is "opiate ingestion." Emergency Department records stated, "Household substance abuse concerns: No." The Emergency Department records also stated, "[M]om saw pt put something white in mouth and was unresponsive w/in minutes; ems sts pupils were pinpoint, gave 1 mg intranasal Narcan and pt became responsive." Laboratory results stated that none of the tested drugs, including opiates, were detected.

CPD Sergeant Jason Sanders testified that he investigated the Defendant's case. He said he responded to the hospital on July 1, 2022, where he spoke with Ms. Anderson and the Defendant. He said the Defendant told him that she did not use drugs in Ms. Anderson's house and that "there weren't any drugs." Sergeant Sanders said the Defendant stated that Ms. Anderson's former roommate, who had moved out two months earlier, might have "dropped or left something." Sergeant Sanders said that, because the victim exhibited signs of opiod overdose, he obtained the victim's blood samples from the hospital. He said the samples were later tested by the TBI laboratory and that fentanyl was detected.

Sergeant Sanders testified that, after receiving the blood sample results in October 2022, he interviewed Ms. Anderson and the Defendant. A recording of his interview of the Defendant and her written statement were received as exhibits. The recording was played for the jury and reflected the following: The Defendant was accompanied by her mother when she spoke with Sergeant Sanders. The Defendant said that on July 1, 2022, she was using her cell phone and saw the victim "get ahold of something." She was unsure at the time what the victim picked up but later realized it was "something [she] had," which she clarified was a "Roxy M30" pressed pill. She agreed that it was her pill that had been dropped or lost under the bed. She acknowledged that she had seen the victim put the pill in his mouth and agreed that after the victim ingested the pill, she took him to the bathroom and splashed him with cold water and had her mother call for an ambulance. She said she had just returned home from work and had not been "under the influence" but had been tired. She said that the aluminum foil later collected as evidence had been "David's." The Defendant said she "never did anything" around the victim. The Defendant's mother agreed that she found the aluminum foil on the floor under the bed. The Defendant stated that David had the foil "at the top of the closet" and that, after she questioned him about it, he put it behind a bed pillow. She said the victim found a pill, not the aluminum foil, and she agreed that she knew "what the pill would do to him if he picked it up." After the Defendant wrote and signed a statement, she told Sergeant Sanders that the pill probably had belonged to "David." She said she always had to "clean up after" David. She said she thought the pill was David's but that she would "take the blame for it." She said that it was her drug of choice but that she would not have left "anything laying around." She acknowledged that David brought her drugs and that they used drugs together, even though they were no longer "together." She said David did not bring her the pill the victim ingested. She said she first asked David to find pain pills for her after the birth of her youngest child.

The Defendant's written statement included the following: "I was on my phone and glanced at him putting something in his mouth. I was to[o] late and he had already swallowed what he put in his mouth and at the time I wasn't exactly sure what it was. I yelled for my mother to call an ambulance."

Sergeant Sanders testified that aluminum foil was used for "pill ingestion." He said a drug user could use aluminum foil to heat crack cocaine or heroin. He said the Defendant stated that the aluminum foil recovered as evidence "was from something else." Sergeant Sanders agreed that the Defendant contradicted herself in her interview, stating that that a pressed M30 fentanyl pill was "David's" but also stating that it was hers. Sergeant Sanders agreed that the Defendant said she "always had to clean up after" David and that she "knew how dangerous this was." He said that, around the time of the incident, the police department responded to numerous fentanyl overdose incidents.

TBI Special Agent Joe Castelbuono, an expert in forensic toxicology, testified that he examined the samples of the victim's blood and urine. He said that the victim's blood contained one nanogram of fentanyl and that the victim's urine tested positive for fentanyl and naloxone, the latter of which he explained was Narcan. He said the presence of naloxone would not affect the concentration of fentanyl in a person's blood. He said that fentanyl created respiratory distress and could cause respiratory failure. He agreed that the symptoms of fentanyl use could include lethargy and dilated or constricted pupils. He said that it must be ingested to have an effect and that merely touching it "[m]ore than likely" would not have any effect. He later acknowledged that touching a potent form of powder fentanyl could result in transdermal ingestion. In his opinion, one nanogram of fentanyl could be lethal. He said that the reactions people had to fentanyl varied and that he was aware of a person surviving despite the presence of seventy-five nanograms of fentanyl in the person's blood. He said that fentanyl was generally ingested in pill form or was "melted down and injected or snorted." He said that a fentanyl user might place an M30 pressed fentanyl pill in a piece of aluminum foil, apply heat, and inhale the smoke. He identified fentanyl as a Schedule II controlled substance.

Regarding the victim's initial negative drug screen at the hospital, Agent Castelbuono testified that a distinction existed between opioids and opiates. He acknowledged that the victim's hospital screening had been negative for the presence of opiates and explained that fentanyl was an opioid. He said that the opiate screening performed in the TBI laboratory was negative and that this test did not screen for fentanyl.

Agent Castelbuono testified that a person could experience withdrawal symptoms for a period of days after fentanyl use. He said that accidental ingestion was "incredibly dangerous." He said that withdrawal was possible after a single ingestion and that withdrawal symptoms for more than a day or two would be unlikely. He agreed that withdrawal symptoms such as shaking, twitching, and difficulty sleeping were possible "beyond a day or two."

Detective Jason Sanders was recalled and testified that fentanyl was "very dangerous for an accidental overdose." He said fentanyl could be smoked using aluminum foil.

Detective Sanders testified that no blood sample was collected from the Defendant. He said that she and the victim's father both had "a drug history." Detective Sanders said that Ms. Anderson stated that the Defendant "ha[d] a habit of going in the bathroom shortly after" the victim's father came to the home and that the Defendant had done this earlier on July 1, 2022. He said the Defendant admitted in her statement that she had used drugs earlier on July 1, and he noted that her statement was given months later.

DCS Investigator Dwight Webster testified that he spoke with the Defendant on October 17, 2022. He said she had been forthcoming and admitted that she had used "Roxy" pills for over a year. He said he administered a drug test, which the Defendant passed.

The defense elected not to present proof. After receiving the evidence, the jury found the Defendant guilty of aggravated child neglect. Later, the trial court conducted a sentencing hearing and imposed a sixteen-year sentence to be served at 100%. This appeal followed.

# I

## Thirteenth Juror and Sufficiency of the Evidence

The Defendant contends that the trial court erred in approving the verdict in the court's role as thirteenth juror. In a related issue, she contends that the evidence is insufficient to support her aggravated child neglect conviction because the State failed to prove beyond a reasonable doubt that the victim suffered serious bodily injury. The State responds that the Defendant is not entitled to relief because her argument relies upon a misreading of the aggravated child neglect statute and that, in any event, the evidence is sufficient to support her conviction. We agree with the State.

Tennessee Rule of Criminal Procedure 33(d) provides, in pertinent part, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." Trial judges exercising their thirteenth juror function are acting as jurors. "[T]he trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand." *Bolin v. State,* 405 S.W.2d 768, 771 (Tenn. 1966). Thus, proper factors to be weighed by the trial court include the witness's testimony, demeanor, and credibility, all factors likewise considered by the jury. *See State v. Burlison,* 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). The rule calls upon the trial judge to exercise its role in its traditional capacity. *State v. Dankworth*, 919 S.W.2d 52, 58 (Tenn. Crim. App. 1995).

An appellate court, however, may not function as a thirteenth juror. *Burlison*, 868 S.W.2d at 718-19. The Rules of Appellate Procedure limit the role of an appellate court relative to findings of guilt in criminal cases to the question of whether the evidence "is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." T.R.A.P. 13(e). In this vein, the Rules prescribe that "relief may not be granted in contravention of the province of the trier of fact." T.R.A.P. 36(a). After a trial court has discharged its obligation as thirteenth juror and approved the verdict, appellate review requires "accrediting of the testimony of the witnesses for the state and the resolution of

evidentiary conflicts in favor of the state." *Burlison*, 868 S.W.2d at 719 (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). Thus, our review at this juncture is limited to inquiry into whether the evidence is sufficient to support the conviction.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

As relevant to the Defendant's argument on appeal, aggravated child neglect is defined as follows:

(a) A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a); child neglect, as defined in § 39-15-401(b); or child endangerment, as defined in § 39-15-401(c) and:

(1) The act of abuse, neglect or endangerment results in serious bodily injury to the child;

[or]

(2) A deadly weapon, dangerous instrumentality, controlled substance or controlled substance analogue is used to accomplish the act of abuse, neglect or endangerment;

. . . .

(b) A violation of this section is a Class B felony; provided, however, that, if the abused, neglected or endangered child is eight (8) years of age or less, or is vulnerable because the victim is mentally defective, mentally incapacitated or suffers from a physical disability, the penalty is a Class A felony.

(c) "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

T.C.A. § 39-15-402(a)(1)-(2), (b), (c) (Supp. 2024).  A person commits child neglect "who knowingly . . . neglects a child . . . so as to adversely affect the child's health and welfare[.]" *Id.* § 39-15-401(b) (Supp. 2022) (subsequently amended).  A person acts "knowingly . . . with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist."  *Id*. § 39-11-106(a)(23) (Supp. 2022) (subsequently amended).

The Defendant argues that the evidence is insufficient to support her conviction because the State did not prove that the victim suffered serious bodily injury.  The indictment charged that the Defendant "did unlawfully and knowingly neglect [the victim], a child of eight (8) years of age or less, so as to adversely affect the said [victim's] health and welfare, and a controlled substance was used to accomplish said act of neglect[.]"  The jury was instructed as to this definition of aggravated child neglect.  This definition does not require that the victim suffer serious bodily injury.  Thus, the Defendant's conviction is premised upon the mode of the offense described by Code section 39-15-402(a)(2).  The Defendant's argument that the State failed to prove serious bodily injury is misplaced, inasmuch as serious bodily injury to a victim was not an element of the offense as charged in this case.

Viewed in the light most favorable to the State, the evidence showed that the Defendant permitted the thirteen-month-old victim to play on the floor while the Defendant used her cell phone.  The Defendant saw the victim place something in his mouth, after which the victim began losing consciousness and required emergency medical intervention, including the administration of Narcan.  The victim was later determined to have had fentanyl in his system, and the Defendant admitted that she was a drug user and that the pill the victim ingested had been hers.  According to Ms. Mainord, the victim continued to have symptoms that included diarrhea, twitching in his sleep, and lack of balance for weeks after ingesting fentanyl, and he required additional medical care.  In her statement, the Defendant admitted that she knew the danger that fentanyl pills posed to the

victim. A TBI Agent testified that fentanyl was a controlled substance. A rational jury could conclude from this evidence that the Defendant knowingly neglected the victim, who ingested a controlled substance, causing adverse effects to his health and welfare. A rational jury could find, as well, that the victim was eight years old or younger. The evidence is sufficient to support the Class A felony aggravated child neglect conviction.

## II

## Sentencing

The Defendant contends that the trial court abused its discretion in sentencing her to serve sixteen years. She argues that the court should have imposed a sentence of fifteen years, either entirely on community corrections or, alternatively, with five years' incarceration followed by ten years on community corrections. The State counters that the court did not abuse its discretion and that the Defendant has waived any claim regarding community corrections because she did not ask the trial court to impose a community corrections sentence. We conclude that the Defendant is not entitled to relief.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103 (2019), -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The Defendant, a Range I offender, was convicted of a Class A felony and faced a fifteen- to twenty-five-year sentence. *See* T.C.A. § 40-35-112(a)(1) (2019). A sentence for aggravated child abuse must be served at 100%. *Id.* § 40-35-501(i)(1), (2)(K) (Supp. 2022) (subsequently amended).

At the sentencing hearing, the trial court received the presentence report, which reflected that the then-twenty-three-year-old Defendant was a mother of three young sons. She reported that she dropped out of a high school in grade eleven because she was pregnant and that she had been employed as a bartender and server. While incarcerated, she obtained her GED and began taking college courses. She stated that she began using drugs in 2022 and became addicted to fentanyl. She enrolled in a three-month, inpatient substance use treatment program in July 2022 but left after three days when she learned that "her former friend filed for custody of her son." The Defendant had been placed on judicial diversion for misdemeanor theft and misdemeanor fraudulent use of a credit card, but the record fails to reflect whether the Defendant successfully completed the terms of diversion.[1] The risk and needs assessment attached to the presentence report rated the Defendant at low risk to reoffend.

The victim impact statement attached to the presentence report was completed by the victim's custodial caregiver and stated that the victim had been injured by the Defendant's actions because he "had tremor[,] night sweats, diarrhea, and off balance due to the narcotic and the narcan." The caregiver also stated that the victim had withdrawal symptoms for "days/weeks after the incident" and that the early childhood intervention therapists provided services to the victim for two to three months as a result of the incident. She said the victim "had became [sic] a thriving, intelligent, typical two year old."

Tennessee Chief Medical Examiner Adele Lewis, M.D., a forensic pathology expert, testified that, at the time of the hearing, fentanyl was responsible for about 80% of the fatal drug overdoses in Tennessee. She said that Tennessee had five child and infant deaths from fentanyl overdoses in 2022. She explained various modes of accidental fentanyl ingestion and stated that a child would be affected by a lower dose of fentanyl than an adult. She said that in a child under eighteen months old, a fentanyl concentration of one nanogram per milliliter would cause sleepiness, might cause breathing difficulty, and might cause the child to turn blue. She said that in the absence of treatment, such as with Narcan, death could result.

---

[1] At the sentencing hearing, the trial court referred to "convictions" for these offenses.

Corporal Mac Hull[2] identified his body camera recording of a November 8, 2021 traffic stop of David Gunn. Corporal Hull said that "a large amount of fentanyl and other narcotics and various other items" were recovered from the car. Corporal Hull said that the Defendant and her mother, Ms. Anderson, were present during the stop. Corporal Hull said that Ms. Anderson was the car's registered owner and that the Defendant's purse or identification were inside the car. The recording was received as an exhibit and played for the court. In the recording, Ms. Anderson stood outside the car by the driver's door. An officer advised her that fentanyl had been recovered from the car and that the car needed to be cleaned because fentanyl could be fatal. The officer told Ms. Anderson that he did not want any children to be hurt. The Defendant stood at the rear corner on the passenger side of the car.

After receiving this evidence, the trial court found that the Defendant's sentence should be enhanced based upon her prior history of criminal convictions or behavior, stating, however, "I don't give it great weight in this case." *See id.* § 40-35-114(1) (Supp. 2022) (subsequently amended). The court found that the Defendant had no hesitation to commit the offense when the risk to human life was high. *See id.* at (10). The court found that no mitigating factors applied. *See id.* § 40-35-113 (Supp. 2024).

The trial court found that the Defendant showed greater accountability than was typical for a criminal defendant, based upon her written statement submitted with the presentence report. The court also noted that the Defendant had given credible testimony in a criminal case involving another defendant. The court also noted the Defendant's efforts to further her education while incarcerated. The court found that the appropriate sentence was sixteen years to be served in the Department of Correction.

The Defendant does not argue that the trial court erred in applying enhancement factors (1) and (10), nor does she argue that the court should have applied any mitigating factors. *See id.* §§ 40-35-113, 40-35-114(1), (10). The court made factual findings to support its application of the two enhancement factors. The record reflects, as well, that the court stated that it had considered the relevant principles of sentencing and the facts of the case in arriving at its sixteen-year length-of-sentence determination, or one year above the fifteen-year minimum sentence. The Defendant has not shown that the court abused its discretion in imposing the sixteen-year sentence. *See Bise*, 380 S.W.3d at 706-07.

With regard to the Defendant's argument that she should have received a sentence involving community corrections, defense counsel acknowledged at the hearing that community corrections was not an available sentencing alternative in the jurisdiction,

---

[2] Corporal Hull's law enforcement agency was not identified in the sentencing hearing transcript.

stating, "Now, I would argue she is entitled to community corrections, but I understand we don't have that here." The trial court found that community corrections was not "available" but that, in any event, a sentence to community corrections would not be appropriate in this case. We conclude that the Defendant, at least obliquely, raised community corrections as a sentencing alternative at the hearing, and we decline the State's urging to treat the issue as waived because community corrections sentencing was not requested at the hearing.

That said, we are aware that, despite the statutory provisions for community corrections as a sentencing alternative, many judicial districts in Tennessee currently do not have community corrections programs. In the trial court, the Defendant did not raise any legal challenge to the unavailability of community corrections as a sentencing alternative, and she has offered no legal basis upon which this court might conclude that the trial court abused its discretion by failing to sentence her to a program which was nonexistent in the jurisdiction. By virtue of her conviction for aggravated child neglect, the Defendant was statutorily ineligible for probation. *See* T.C.A. § 40-35-303(a) (Supp. 2022) (subsequently amended). In addition, the minimum sentence for the conviction offense is fifteen years, and a defendant cannot be sentenced to probation for a sentence that exceeds ten years. *Id.* §§ 40-35-303(a); 40-35-112(a)(1). Given the lack of a community corrections program and the Defendant's ineligibility for probation, incarceration was the only available option. *See generally id*. § 40-35-104(c) (Supp. 2024) (alternative sentences). The Defendant has failed to show that the trial court abused its discretion in sentencing her to serve her sixteen-year sentence. She is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

**s/ Robert H. Montgomery, Jr.**
ROBERT H. MONTGOMERY, JR., JUDGE

- 13 -